Belknap,
No. 5415.

NORMAN L. JESSEMAN

*v.*

MARY H. (SPENCER) AURELIO & a.

Argued November 4, 1965.
Decided December 7, 1965.

*Hall, Zellers, Morse & Gallagher* (*Mr. Charles T. Gallagher* orally), for the plaintiff.

*Wescott & Millham* (*Mr. Peter V. Millham* orally), for the defendant Aurelio.

*Snierson & Chandler (Mr. John P. Chandler* orally), for the defendants Wilkes and Lakes Region Playhouse, Inc.

DUNCAN, J. The plaintiff seeks to enforce an oral agreement for the sale of certain land in Gilford, as evidenced by the following memorandum drafted by the plaintiff and signed by the parties: "Agreement. It is hereby agreed that when I sell my property at the intersection of Route 11 and 11B, Gilford, N. H. I will reserve a parcel of land on the Harris Shore Road approximately 300 feet from the Westerly point near the beach to an open sand pit; then in a Northerly direction and at right angle, for about 500 feet to the brook; and then in a Southwesterly direction to point of beginning for you at an agreed on sale price of $2,200.00. The above described lot may be used by you from this date on without obligation. (signed) Mary H. Spencer Prospective purchaser Norman L. Jesseman Witness to both Jessie M. Jesseman March 23, 1961."

The land in question was a part of a larger tract owned by the named defendant. The parties examined the property on March 8, 1961, and on March 23, 1961 the memorandum was signed by them in the plaintiff's office in Concord. In September 1962 the defendant conveyed a portion of her land to the defendant Wilkes and the balance, including the premises involved in these proceedings, to the defendant Lakes Region Playhouse, Inc. For purposes of the motion to dismiss the Trial Court found that these purchasers had actual notice of the plaintiff's claim.

At the trial the evidence heard by the Court related primarily to the issue of the adequacy of the description of the land contained in the memorandum. A surveyor called by the plaintiff identified "the Westerly point near the beach," referred to in the memorandum, as a point on Harris Shore Road at land of Normandin, which was marked by a wire fence. Harris Shore Road proceeded from there along the defendant's land in a generally southeasterly direction to where a pile of stones was situated at the edge of a gravel pit, a distance of 282.6 feet from the point of beginning. Since the road curves slightly to the southeast over this distance, in order to locate a line at a right angle to the road, the surveyor ran it at a right angle to a chord connecting the point of beginning with a point on the road 282.6 feet southeasterly of the pile of stones. The division line which he thus established as at a right angle to the road ran north 64° east 262.9 feet to the high water mark of Adder Hole Brook. If ex-

tended to the center line of the brook, this division line would be approximately 400 feet in length. The course of the brook from the point of intersection of the division line, back to the north-westerly corner of the defendant's land at the wire fence is generally northwesterly and westerly, over a distance of some five to six hundred feet. The distance from the brook to the road at the Normandin land, along the wire fence to the point of beginning, is approximately 50 feet. The plaintiff seeks to enforce an agreement to sell a tract thus located.

The plaintiff's testimony was that when the parties went to the land on March 8, 1961, there were several inches of snow on the ground and that he walked from Harris Shore Road to the brook at the Normandin line and then returned to the road and accompanied the defendant Aurelio to the pile of stones. No other entry was made upon the lot. The plaintiff testified that he paced the distance along the road to the gravel pit and estimated the distance at 300 feet; and that at the gravel pit he could see perhaps 200 feet into the woods but could not see the brook. He testified that he thereafter drafted the memorandum which was signed by the parties on March 23, 1961.

At the close of the plaintiff's testimony, the Trial Court expressed the view that "this is a contract with no agreement on the part of the purchaser as to anything he would do," and stated that he "would grant a motion to dismiss at this point." The defendants thereupon moved to dismiss. The plaintiff then offered to prove that on the day when the memorandum was signed and as a part of the same transaction he loaned the defendant $2,200 in the office of a Concord lawyer, who prepared the note and mortgage. The plaintiff also offered to prove that thereafter, and prior to July 1962, he entered upon the property, caused a driveway to be bulldozed and graveled, moved a trailer onto the land, installed a water pipe to the lake and a pump, and erected a combination pump and storehouse, and a dock; that in July 1962 the defendant Aurelio settled her differences with the other defendants and agreed to sale of her entire property to them; and that the property was conveyed to these defendants by deeds given in September 1962.

Following the offer of proof, the Trial Court stated that he would "consider all of the evidence as having been offered and accept it as my findings of fact except as indicated otherwise in my findings and rulings." The Court confirmed counsel's understanding that this was "for purposes of this motion [to dismiss]."

The Court ruled on the basis of all the testimony, whether received or offered, that "equity does not require enforcement of this agreement," that "as far as the agreement is concerned, the location of the boundary line beginning with the pile of stones . . . is impossible for a Court to determine . . . and so equity may not enforce specific performance in this case." The Court further ruled that the agreement was "not only ambiguous as to the location of the boundary line . . . but . . . did not provide for any requirement by the purchaser to purchase the property at any time"; and if it was to be considered an option, "there was no evidence that there was a substantial or any real consideration paid for such option; and so the Court would not enforce it in equity."

We think it evident from the record as a whole that in ruling on the motion to dismiss, the Trial Court accepted the plaintiff's evidence and his offer of proof as true and ruled as a matter of law that the action could not be maintained because the description of the land contained in the memorandum was too uncertain to be enforceable, and because the memorandum was unenforceable for lack of evidence of any consideration moving from the plaintiff. See *Langdon* v. *Sibley*, 100 N. H. 373.

It is settled law that in order to satisfy the requirements of the statute of frauds an agreement for the sale of real estate must be evidenced by a memorandum in writing signed by the party to be charged (RSA 506:1); and ordinarily a binding agreement for the sale of real estate will be specifically enforced in equity because the unique character of real estate makes the damages for breach of contract irreparable as a matter of law. *Gulf Oil Co.* v. *Rybicki*, 102 N. H. 51, 52.

A memorandum is sufficiently definite to satisfy the statute of frauds if it is "reasonably certain from the contract itself and the acts of the parties in performance of it what land was intended." *White* v. *Poole*, 74 N. H. 71, 73. "Reasonable certainty is all that is demanded and that requirement is fulfilled if the meaning of the contract, as a whole, is intelligible to the court." *Kann* v. *Company*, 81 N. H. 535, 541.

"If the descriptive language used is clear and explicit in denoting a particular lot of land, it is not essential that it should contain a statement of its boundaries, its geographical location or other designations frequently used in formal conveyances of real estate. If it has that characteristic, parol evidence is admissible to apply the abbreviated description to the land thus clearly

indicated." *Gilbert* v. *Tremblay,* 79 N. H. 431, 432. See Annot. 23 A.L.R. 2d 6. It may also be noted that in *Kann* v. *Company, supra,* the court pointed out that "the difficulty regarding uncertainty has probably been overemphasized" and "should not be allowed to hamper equitable relief further than necessity requires." *Id.,* 541. See 5 Williston on Contracts (Rev. *ed.*) *s.* 1424; 4 Williston on Contracts (Jaeger, 3d *ed.*) *s.* 576; *Packard* v. *Putnam,* 57 N. H. 43, 51.

We think it could reasonably be found from the memorandum, coupled with the evidence received by the Court, that the agreement of the parties was for the sale to the plaintiff of the defendant's land lying between the brook and the road which was westerly of a line at a right angle to a line along the road between the point of beginning at the fence, and the point at the pile of stones at the "open sand pit" or gravel pit. From an examination of the survey which was an exhibit in the case, it appears that such a line would run north 54° east, or approximately 10° north of the line A-B as shown on the plan.

Except for the line between the road and the brook at the gravel pit, the boundaries were ascertainable by determination of the extent of the defendant's ownership. *Packard* v. *Putnam,* 57 N. H. 43, *supra,* 51. The office of the memorandum was to evidence the oral agreement of the parties, and it was to be interpreted in the light of the circumstances surrounding the parties when it was made. *Id.* The defendant admittedly owned the land between Harris Shore Road and Adder Hole Brook as a part of her "property at the intersection of Route 11 and 11B, Gilford, N. H." The memorandum after describing the first boundary as "approximately 300 feet . . . to an open sand pit," proceeded: "then in a northerly direction and at right angle, for about 500 feet to the brook." Since it appeared that a line which proceeded from the sand pit "northerly" would cut back toward the brook at an angle approximately 30° to the road, rather than 90°, it is reasonable to infer that the parties were mistaken as to points of the compass, rather than as to the angle intended.

The fact that the course of the road followed a slight convex curve should not be an insuperable obstacle to location of the dividing line agreed upon by the parties. The surveyor undertook to establish the line by erecting a perpendicular to a chord subtending the curve of the road. In view of the language of the memorandum however, the division line may more properly be located at a right angle to a straight line in the road between

534

the point at the wire fence at the Normandin land, and the point on the road at the pile of stones by the gravel pit. Since the length of the division line is governed by the monuments of the road and the brook, these monuments control over the approximate measurements stated by the memorandum. *Harmon* v. *Kennett Co.,* 103 N. H. 219, 225. Thus interpreted the memorandum could be found to satisfy the statute of frauds, and to afford a basis for a decree of specific performance.

For purposes of specific performance, any lack of a written undertaking to purchase on the part of the plaintiff was supplied by the bringing of his bill in equity, alleging that he is ready, willing and able to purchase. *Swanson* v. *Priest,* 95 N. H. 64; *Gulf Oil Co.* v. *Rybicki,* 102 N. H. 51, *supra.*

If the memorandum should be interpreted as an option to purchase, it could be found upon the evidence offered by the plaintiff that the loan made as a part of the same transaction was consideration for the undertaking contained in the memorandum. *Hutt* v. *Hickey,* 67 N. H. 411; *Kidd* v. *Traction Co.,* 74 N. H. 160, 173. We therefore conclude that the plaintiff's bill was erroneously dismissed, and that it should be remanded for consideration of its merits.

*Exception sustained; remanded.*

All concurred.