949 A.2d 693 (2008)
Michael J. GLICK, D.D.S.
v.
CHOCORUA FORESTLANDS LIMITED PARTNERSHIP.
No. 2007-037.
Supreme Court of New Hampshire.
Argued: January 16, 2008.
Opinion Issued: May 16, 2008.
As Modified on Denial of Rehearing June 25, 2008.
*694 Douglas, Leonard & Garvey, P.C., of Concord (Charles G. Douglas, III and Benjamin T. King, on the brief, and Mr. Douglas orally), for the petitioner.
*695 Hinckley, Allen & Snyder, LLP, of Concord (Christopher H.M. Carter and Daniel M. Deschenes, on the brief, and Mr. Carter orally), for the respondent.
DUGGAN, J.
The petitioner, Michael J. Glick, D.D.S., appeals an order of the Superior Court (O'Neill, J.) denying his petition for specific performance of a right of first refusal he holds for land owned by the respondent, Chocorua Forestlands Limited Partnership (Chocorua). Chocorua cross-appeals, arguing that the trial court erred in finding that Glick possesses valid first refusal rights. We reverse in part, affirm in part, and remand.
The trial court found the following facts: In March 1974, Glick purchased a tract of land that straddles the Ossipee and Moultonborough town line. That property is abutted by Masonian lots 122 and 129 in the town of Ossipee, and Masonian lots 10 and 11 in the town of Moultonborough (Masonian lots). These lots are part of a much larger tract owned by Chocorua.
From 1983 through 1986, Glick and Chocorua engaged in negotiations regarding, among other things, Glick's desire to obtain rights of first refusal over the Masonian lots and Chocorua's desire to obtain certain rights of way across Glick's property. These discussions culminated in an agreement, on June 26, 1986, between Glick, his former wife, Victoria, and Chocorua (the Agreement). Victoria's interests in this matter were subsequently transferred to Glick during their divorce.
In the Agreement, Chocorua agreed to: (1) convey to Glick its right, title and interest in all rights of way allegedly burdening the Glick property within five days of the date of the Agreement; (2) convey to Glick approximately thirteen acres in Ossipee and Moultonborough that abutted the Glick property; (3) split all costs incurred for survey work associated with the Agreement; and (4) make "reasonable efforts to construct a stone and/or earthen barricade at the easterly end of" a road located near the parties' property. In addition, Chocorua agreed to, at "closing," "deliver to the Glicks rights-of-first refusal over the" Masonian lots. Those first refusal rights were to contain, among others, the following three terms:
(a) [Chocorua] or its successors and assigns shall, within fourteen (14) days of executing a purchase and sale agreement with a bona fide purchaser with respect to all or any portion of the encumbered Lots, send to the Glicks by certified mail, return receipt requested, a copy of the purchase and sale agreement.
(b) The Glicks shall have thirty (30) days from receipt of said notice to exercise their rights-of-first refusal by tendering to [Chocorua] the proposed purchase price by cashiers or certified check. In the event of such a tender, closing shall be held at the same time as called for in the purchase and sale agreement. . . . In the event such a tender is not made within the time specified herein or in the event of a failure by [the] Glicks to close as provided herein, the rights-of-first refusal shall terminate as to that portion of the encumbered lots in question.
(c) In the event of termination of the rights-of-first refusal with respect to all or a portion of the Lots as provided hereinabove, [Chocorua] or its successor in interest where applicable may but shall not be required to . . . record in the Carroll County Registry of Deeds an affidavit setting forth a description of the Lots affected, and a statement that a copy of the affidavit was mailed to the Glicks by certified mail return receipt requested fifteen (15) days prior to the *696 recording of the affidavit at the Carroll Country [sic] Registry of Deeds and that no objection by the Glicks was received by [Chocorua] or its successor in interest prior to recording of the affidavit.
In the Agreement, Glick agreed to: (1) convey to Chocorua two rights of way over his property; (2) convey to Chocorua a specified acre of land that would facilitate Chocorua's access to its property; and (3) pay Chocorua $6,100 for the thirteen acres. Although the Agreement provided that subsequent conveyances would be made, it also dictated that "all obligations and rights under this [A]greement shall survive the delivery of the deeds contemplated in this Agreement."
The deeds contemplated by the parties in the Agreement were recorded on September 3, 1986, and Glick transferred $6,100 to Chocorua approximately one month later. But the "closing" referenced in the right of first refusal provision never occurred, and no further documents regarding those rights were created. Instead, on October 16, 1986, the Agreement itself was recorded in the Carroll County Registry of Deeds.
The testimony offered at trial regarding the recording of the Agreement varied. According to Glick's attorney at the time, Edward E. Lawson, he and Chocorua's attorney, David W. Rayment, agreed that the Agreement adequately defined the rights of first refusal and, thus, that there was no need to prepare the additional document originally contemplated by the parties. Lawson testified that Rayment concurred that recording the Agreement itself would be sufficient to place third parties on record notice of Glick's first refusal rights. In support of Lawson's testimony, Glick submitted a letter he received several months after the Agreement was recorded in which Lawson states that Rayment had "agreed that recording the [A]greement was sufficient . . . [and that t]he right of first refusal is on the record and in effect."
Rayment, in contrast, could not recall having any conversation with Lawson regarding the recording of the Agreement. Moreover, he asserted that he never would have agreed to record the Agreement because it lacked "essential terms"  such as a provision granting Chocorua access to its remaining land in the event of the sale of the Masonian lots  and contained provisions he did not want disclosed to the public. According to Rayment, the parties had agreed that Lawson would draft the separate first refusal document, but they had "simply forgotten" about the issue.
Following the recording of the Agreement, there were no further communications between the parties regarding the rights of first refusal until November 4, 1998. At that time, Glick received a letter from Chocorua's then counsel, Robert Lloyd, informing him that Chocorua had entered into a purchase and sale agreement (P & S Agreement) with F. Colin Cabot and FCC Acquisition Co. (Cabot) for "all of the land that is subject to an apparent right to first refusal granted to [Glick] and the former Mrs. Glick by Chocorua." Lloyd stated that "[u]nder the terms of the right of first refusal [Glick] ha[d] thirty (30) days from the receipt of th[e letter] to exercise [his] rights of first refusal by tendering to [Chocorua] the proposed purchase price" of $375,000. Attached to the letter was a copy of the P & S Agreement, which similarly acknowledged Glick's first refusal rights. The record indicates that the sale of the Masonian lots was part of a much larger multi-million dollar sale of essentially all of Chocorua's assets to Cabot.
Following Glick's receipt of notice of the P & S Agreement, the parties' lawyers *697 exchanged several communications regarding Glick's belief that: (1) the purported purchase price was excessive; (2) the thirty-day period originally prescribed by the Agreement should be extended in recognition of the fact that subdivision approval would be required for the sale of the lots; and (3) he should be permitted to exercise his rights of first refusal over only a portion of the Masonian lots. These communications continued until November 25, 1998, when Lloyd sent Glick and Lawson a fax, advising them that the Agreement had been "cancelled and terminated" and that "any right of first refusal [Glick] may have is" no longer exercisable.
That same day, Cabot's counsel, Howard G. Seitz, sent a fax to Lloyd confirming a conversation which they had that morning. In that fax, Seitz acknowledged that Cabot had cancelled the P & S Agreement, but noted they had "agreed to review the transaction pursuant to which [Cabot was] to acquire the Chocorua lands subject to equitable adjustment for the so-called `Glick Property' with the thought, amongst others, that, if appropriate, [Cabot] might acquire the partnership interests of Chocorua['s] partners rather than the property itself."
At trial, Lawson testified that, immediately prior to receiving notification that the P & S Agreement had been cancelled, he spoke with Lloyd and informed him that Glick intended to exercise his first refusal rights. Glick also testified that several days prior to receiving Lloyd's fax, he spoke with Seitz and informed him of the same. However, the trial court found that "no documentation or communication was exchanged between respective counsel or the parties that indicated that Glick was unconditionally accepting the terms of the P & S Agreement prior to Glick's notification of its cancellation."
In February 1999, roughly two months after terminating the P & S Agreement, the general and limited partners of Chocorua sold their partnership interests, including their interest in the Masonian lots, to Cabot. In response, Glick filed the present action, arguing that his first refusal rights entitle him "to a decree of specific performance, compelling the defendant to sell him the . . . [Masonian lots], at [their] fair market value." Chocorua objected, claiming that Glick did not have first refusal rights because the separate document referenced in the Agreement was never executed. Moreover, Chocorua argued that even if Glick had such rights, they would not have been triggered by the transfer of the partnership interests in Chocorua to Cabot.
Both parties subsequently filed motions for summary judgment. In his motion, Glick argued, among other things, that "once the Rights of First Refusal were triggered [by his receipt of notice of the P & S Agreement, he] had an option to purchase the land in question." Because numerous material facts remained unresolved  including the actual acreage of the Masonian lots, the enforceability of the Agreement, whether the Agreement memorialized the parties' intentions, whether the parties had acted in good or bad faith, and whether Glick had exercised his rights  the trial court denied Glick's motion on July 31, 2001, "with one narrow exception." That narrow exception, as explained by the court, was as follows:

if it is determined that Glick possessed a valid right of first refusal (which, the Court is not finding in this Order), and if, in addition, the terms of . . . [the] Agreement alone define that right, then Glick, upon receipt of the . . . letter [from Chocorua], would have been the holder of a thirty day option to purchase the property described in the [P & S Agreement] for the price therein stated.
*698 Following trial, the trial court issued its final order and held "[t]hat an enforceable right[ ] of first refusal on the . . . Masonian lots was granted to Glick by Chocorua and continues to encumber the said Masonian lots." While the court agreed with Chocorua that "it is entirely possible, perhaps probable, that additional terms would [have] be[en] included in" the separate first refusal document contemplated by the parties, the court held that the Agreement nevertheless "encompassed the rights and obligations placed on each respective party." Accordingly, the court found that the Agreement "represent[ed] a `meeting of the minds' as to the subject first refusal right[s]" and that the first refusal provision in the Agreement was "an enforceable contract."
The court, however, declined "to order a sale of the . . . Masonian lots for any price" because the P & S Agreement "was cancelled and/or terminated prior to Glick exercising his right[ ] of first refusal." Moreover, because "the subsequent transfer of Chocorua's partnership interest in 1999 did not trigger Glick's right[ ] of first refusal," the court held that Glick had no right to force the sale of the Masonian lots. Finally, the court found that Glick failed to prove that Chocorua had acted in bad faith by entering into the partnership sale with Cabot.
On appeal, Glick makes three principal arguments for reversal: First, he contends that, upon his receipt of notice of the P & S Agreement, his right of first refusal ripened into an option that was irrevocable for the thirty-day period stated in the Agreement. Second, he argues that the trial court erred in refusing to find that Chocorua acted in bad faith. Third, he asserts that the trial court's July 31, 2001 summary judgment order, when considered in light of the findings made in the final order, compels an order of specific performance. Because we agree with Glick that, under the facts presented in this case, the Agreement gave him a thirty-day irrevocable option to purchase the Masonian lots, we need not reach all of his latter arguments.
I. Right of First Refusal
Glick's first argument raises an issue we have not yet had occasion to consider; that is, whether a right of first refusal, once triggered, is exercisable for the entire period of time specified by the parties, even though the third-party contract has been terminated. Glick contends that, as a matter of law, a right of first refusal always ripens into an irrevocable option once the holder has received notice of the burdened estate's intent to sell. In so arguing, he urges us to follow those authorities that have stated broadly that "[o]nce the holder . . . receives notice of a third party's offer, . . . the holder of the option has a right to buy the property, a right that is a true option." 17 C.J.S. Contracts § 56, at 503 (1999); see, e.g., Riley v. Campeau Homes (Texas), Inc., 808 S.W.2d 184, 188 (Tex. App.1991) (stating that "a right of first refusal ripens into an option when the owner elects to sell"); Chapman v. Mutual Life Ins. of New York, 800 P.2d 1147, 1150 (Wyo.1990) ("We agree with the view that when the condition precedent of the owner's intention to sell is met the right of first refusal `ripens' into an option and contract law pertaining to options applies."); Vorpe v. Key Island, Inc., 374 So.2d 1035, 1036-37 (Fla.Dist.Ct.App.1979) (explaining that once the owner of property manifests the intent to sell, the "right of first refusal [i]s converted into an irrevocable option to purchase").
Chocorua, in similarly absolute fashion, argues that a right of first refusal only gives the holder a right to receive notice of a proposed third-party sale and that, once *699 such notice has been sent, "the offeree has `received the bargained-for performance,' and cannot insist that the offer remain open after the third-party sale is abandoned." In support of its position, Chocorua relies primarily upon LIN Broadcasting Corp. v. Metromedia, Inc., 74 N.Y.2d 54, 544 N.Y.S.2d 316, 542 N.E.2d 629, 630 (1989), which held that "an offer, once made to the holder of a right of first refusal, is [not] irrevocable for the period of time set forth in the first refusal clause." See also Shower v. Fischer, 47 Wash.App. 720, 737 P.2d 291, 293 (1987) (indicating that a right of first refusal only gives the holder the power to purchase for so long as the underlying third-party contract is in existence).
While we recognize that authority exists in support of both parties' positions, we do not believe that adoption of a rigid rule that applies to all contracts that contain the phrase "right of first refusal" is sound. Generally speaking, "a right of first refusal is a conditional option which is dependent upon the decision to sell the property by its owner." 17 C.J.S. Contracts § 56, at 503. It differs materially from an option contract, Polemi v. Wells, 759 P.2d 796, 798 (Colo.Ct.App.1988), in that it is not an "offer[] and create[s] no power of acceptance" in the holder. 3 E. Holmes, Corbin on Contracts § 11.3, at 468 (rev. ed. 1996). Rather, a right of first refusal generally "empowers its holder with a preferential right to purchase property on the same terms offered by or to a bona fide purchaser." 17 C.J.S. Contracts § 56, at 503.
However, the practical reality is that the labels  such as "right of first refusal"  applied by contracting "parties do not always mirror the economic reality of the instruments involved." Walker, Rethinking Rights of First Refusal, 5 Stan. J.L. Bus. & Fin. 1, n. 14 (1999). As Corbin has observed:
Although the [r]ight that it creates may be described by divers[e] terms ("First Right to Buy," "Right of Pre-emption," . . . and so on), in no case are the legal relations [between the parties contracting for a right of first refusal] determinable from the name alone. In all cases, interpretation requires knowledge of the entire context, context of facts as well as context of words.
3 E. Holmes, supra § 11.3, at 481; see also Smith Trust, 480 Mich. 19, 745 N.W.2d 754, 757-58 (2008) (holding that determination of "whether a right of first refusal is revocable once the holder of the right receives notice of a third party's offer" requires interpretation of the contract language); Henderson v. Nitschke, 470 S.W.2d 410, 411 (Tex.Civ.App.Ct.1971) (stating that "[t]he determination of the rights of the parties [under a right of first refusal provision] requires an interpretation of . . . the lease").
Moreover, it has long been our practice to focus upon the intent of the parties, as manifested in the language of the entire contract, in defining the parties' respective rights. Cf. Swamscot Machine Co. v. Partridge, 25 N.H. 369, 376-79 (1852) (holding that the express, unambiguous language of the parties' agreement controls despite contrary evidence of industry custom or usage). The parties have offered no principled reason for departing from this settled approach simply because we are faced with language purporting to create "rights of first refusal." Cf. Turcotte v. Griffin, 120 N.H. 292, 294, 415 A.2d 668 (1980) (upholding a trial court's use of the rules of contract interpretation when interpreting a lease which contained an option to purchase). We therefore reject both parties' implicit argument that their use of the phrase "right of first refusal" ends the inquiry. Instead, we agree with those authorities that have *700 held that "the contract terms establishing a right of first refusal . . . control whether the right . . . becomes an irrevocable option once triggered or, instead, may be revoked by the owner if he in good faith changes his mind  and withdraws his offer to sell  before the right is exercised." Smith Trust, 745 N.W.2d at 759 (Corrigan, J. concurring); see also Henderson, 470 S.W.2d at 411.
Accordingly, we must look to all of the language of the Agreement in resolving the present dispute. In so doing, we will give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. Ryan James Realty v. Villages at Chester Condo. Assoc., 153 N.H. 194, 197, 893 A.2d 661 (2006). Absent ambiguity, however, we will determine the parties' intent from the plain meaning of the language used in the contract. Id. Ultimately, the interpretation of a contract is a question of law, which we review de novo. Barclay Square Condo. Owners' Assoc. v. Grenier, 153 N.H. 514, 517, 899 A.2d 991 (2006).
As noted above, the Agreement unambiguously required Chocorua, "within fourteen (14) days of executing a purchase and sale agreement with a bona fide purchaser" for "any portion" of the Masonian lots, to "send to [Glick] . . . a copy of" said agreement. The Agreement further provided that Glick, upon receiving such notice, "shall have thirty (30) days . . . to exercise [his] rights-of-first refusal by tendering to [Chocorua] the proposed purchase price by cashiers or certified check."
The Court of Civil Appeals of Texas addressed a similarly worded first refusal provision in Henderson. There, the parties had entered into a lease that granted the lessee the "prior right . . . to buy the leased premises" according to the following terms:
If Lessor receives from a third party an acceptable bona fide offer to buy such property, Lessor shall forthwith give Lessee written notice thereof together with a copy of such offer. Lessee or its nominee shall have sixty (60) days from the receipt of such notice and offer to buy such property at the terms of such offer relating to such property.
Henderson, 470 S.W.2d at 411 (quotations omitted; emphasis added). As in the case before us, the lessor subsequently entered into a written contract to sell the leased premises; sent written notice to the lessee; and, prior to the expiration of the sixty-day period, informed the lessee that he could no longer exercise his first refusal because the third-party offer had been revoked. Id. When the lessee's attempts to exercise his rights were rebuffed, the lessee filed suit seeking specific performance. Id.
On appeal, the court rejected the lessor's assertion that the lessee's right "to purchase [wa]s a mere right of refusal which cannot be called an option," and held that the "determination of the rights of the parties requires an interpretation of" the contract. Id. In engaging in that undertaking, the court found it significant that the first refusal provision granted lessee a definite period of time in which to exercise its right. Id. at 412. The court then determined that the language of the contract dictated that once the lessor "gave lessee written notice of the proposed sale to the third party . . . the first right of refusal matured into an option which was supported by consideration and was irrevocable by the terms of the lease for 60 days." Id.; see Mobil Oil Guam, Inc. v. Tendido, 2004 Guam 7, ¶ 20 (interpreting language similar to that in the present case as creating a "right of first refusal *701 which ripens into an irrevocable option to purchase").
Here, as in Henderson, the condition precedent triggering the right of first refusal was the occurrence of a single, isolated event; that is, Chocorua's execution of a purchase and sale agreement. Nothing in the contract indicates, as Chocorua suggests, that Glick's resultant right to purchase the property was conditioned upon the continued existence of the P & S Agreement. If that had been the parties' intent, they could have crafted the condition precedent to depend upon Chocorua's desire to "sell, transfer or otherwise dispose of its ownership interest to a third party." Cf. LIN Broadcasting Corp., 544 N.Y.S.2d 316, 542 N.E.2d at 630.
Instead, the Agreement explicitly states that, upon receiving notice, Glick "shall have thirty (30) days . . . to exercise [his] rights-of-first refusal." (Emphasis added.) We agree with the Henderson court that the incorporation of this time provision is significant. Henderson, 470 S.W.2d at 411; see Mobil Oil Guam, Inc., 2004 Guam 7 at ¶ 29 (holding that the inclusion of a time period evidences that the right of first refusal was intended to ripen into an irrevocable option to purchase upon being triggered). In common parlance, the word "shall" is "used to express a command," Webster's Third New International Dictionary 2085 (unabridged ed. 2002); see McCarthy v. Wheeler, 152 N.H. 643, 645, 886 A.2d 972 (2005), or to signify something that is required or mandatory, see Dancart Corp. v. St. Albans Rubber Co., 124 N.H. 598, 602, 474 A.2d 1020 (1984) (explaining that, "[w]hen `shall' is contained in a term requiring action by a person identified, the word commonly . . . ha[s] a mandatory character"). Given the mandatory nature of this time provision, as well as the lack of any language conditioning Glick's purchasing power upon the continued existence of the P & S Agreement, we hold that the Agreement granted Glick an irrevocable thirty-day option to purchase the Masonian lots.
Chocorua asserts that, even if Glick held a thirty-day option to purchase the Masonian lots, he cannot obtain specific performance because he "never tendered $375,000 to [Chocorua], as required under the first refusal provisions of the" Agreement. In other words, Chocorua contends that, despite its premature repudiation of his option, Glick was required to engage in the futile act of offering payment in order to preserve his right to relief in this case. As Justice Souter explained in Erin Food Services, Inc. v. Derry Motel, 131 N.H. 353, 362, 553 A.2d 304 (1988), such an argument "ignores . . . the rule excusing formal tender to a party whose repudiation of a contract has previously indicated that tender would be a useless act." (Citation omitted.) Since the evidence indicates that the option was repudiated by Chocorua, equity does not require that Glick show a useless tender. Lowell v. First Church of Christ, 101 N.H. 363, 366, 143 A.2d 671 (1958) (holding that a parties' allegation that they were ready, willing and able to purchase the property subject to an option is sufficient for specific performance); cf. Jesseman v. Aurelio, 106 N.H. 529, 534, 214 A.2d 743 (1965) ("any lack of a written undertaking to purchase on the part of the plaintiff was supplied by the bringing of his bill in equity, alleging that he is ready, willing and able to purchase").
Accordingly, because the Agreement granted Glick a thirty-day option to purchase the property upon his receipt of notice of the P & S Agreement, Chocorua breached the contract by rescinding the offer and Glick is entitled to specific performance. See 81A C.J.S. Specific Performance § 45, at 215 (2004) ("Contractual *702 rights of first refusal to purchase realty may be enforced by a decree of specific performance."). The remainder of Chocorua's arguments on this issue are without merit and sufficient basis in the record, and, thus, do not warrant further consideration. See Vogel v. Vogel, 137 N.H. 321, 322, 627 A.2d 595 (1993).
II. Glick's Remaining Arguments
Glick raises several other arguments in support of his assertion that he is entitled to an order of specific performance. For instance, he asserts that the trial court erred in failing to find that Chocorua restructured its deal with Cabot as a partnership sale for the sole purpose of preventing him from exercising his first refusal. See, e.g., Quigley v. Capolongo, 53 A.D.2d 714, 383 N.Y.S.2d 935 (1976) (holding that a grantor of a first refusal breached the obligation of good faith and fair dealing "by entering into a contract, denominated a lease in the hope of circumventing plaintiffs' rights"). In addition, he asserts that the trial court's July 31, 2001 summary judgment order, when considered in light of the findings made in the final order, compels an order of specific performance. Having already determined that the Agreement gave Glick a thirty-day option to purchase the Masonian lots, and that he is therefore entitled to specific performance, we need not address these arguments.
However, Glick also contends that the trial court erred in failing to find that Chocorua acted in bad faith in setting the purchase price for the Masonian lots. In support of his argument, Glick points to a letter submitted at trial in which Lloyd informed Seitz that the general manager of Chocorua "believe[d] that he can place [a] high enough price on the right of first refusal property so that Mr. Glick will not exercise acquisition." Glick argues that, as demonstrated by this letter, Chocorua inflated the price in the P & S Agreement "in bad faith in an effort to discourage [him] from exercising his rights of first refusal so as not to jeopardize the larger $10 [million] transaction that [Chocorua] was attempting to consummate with" Cabot.
While the trial court granted Chocorua's requested finding that "Glick did not prove his allegations that [Chocorua] had acted in bad faith by purportedly inflating the purchase price of the [l]ots, or overestimating the amount of land contained within the lots," in its order the trial court expressly declined to make findings as to both the size and value of the Masonian lots. Because these facts are inextricably tied to Glick's bad faith argument, see Bank of Vermont v. Kelley, No. CIV 93-46-JD, 1994 WL 258680, at *6-7 (D.N.H. Feb. 4, 1994) (refusing to grant summary judgment on issue of bad faith in case involving a loan workout where disputed material facts remained regarding whether the bank had accepted the fair market value for the property at issue); see also Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 143 (3d Cir. 2001) (explaining how "allocations of price by interested parties to elements of a package [deal] may readily be manipulated to defeat contractual rights to substantially similar price terms"); Gyurkey v. Babler, 103 Idaho 663, 651 P.2d 928, 934 (1982), and we are ill-suited to make such factual findings in the first instance, see Cook v. Sullivan, 149 N.H. 774, 780, 829 A.2d 1059 (2003) (explaining that the trial court is in the best position to "resolv[e] conflicts in the testimony, measur[e] the credibility of witnesses, and determin[e] the weight to be given evidence"), we are unable to assess the trial court's rejection of Glick's bad faith argument upon this record. For similar reasons, we are also unable to resolve *703 Glick's contention that the purchase price in the P&S Agreement was premised upon an erroneous assessment of the size of the Masonian lots. See Pantry Pride Enterprises, Inc. v. Stop & Shop Co., 806 F.2d 1227, 1231 (4th Cir. 1986) (granting specific performance to the holder of a right of first refusal, but remanding for findings as to the value of the encumbered property where performance would result in a windfall). Therefore, upon remand, the trial court shall determine whether the purchase price in the P&S Agreement was inflated and, if it so finds, shall set a purchase price in accord with the fair market value of the property in November 1998, when Glick should have been permitted to exercise his right. If, however, the court finds that the price was not inflated, Glick shall be held to his contractual obligation to proffer the purchase price stated in the P&S Agreement.
III. Chocorua's Cross-appeal
In its cross-appeal, Chocorua argues that the trial court erred in concluding that the Agreement created an enforceable first refusal contract between the parties. Specifically, Chocorua asserts that the trial court's finding that the Agreement "represent[ed] a `meeting of the minds' as to the subject first refusal right(s)," is "incompatible" with the court's determination "that the parties . . . intend[ed] to execute a separate document conveying the first refusal right(s)" that could have contained additional terms. Chocorua argues that, at most, the Agreement represented "an agreement to enter into a contract," which it contends is unenforceable in these circumstances. We disagree.
A valid, enforceable contract requires offer, acceptance, and a meeting of the minds on all essential terms. Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821, 903 A.2d 1003 (2006). A meeting of the minds is present when the evidence, viewed objectively, indicates that the parties have assented to the same terms. Syncom Indus. v. Wood, 155 N.H. 73, 82, 920 A.2d 1178 (2007). "The question of whether a `meeting of the minds' occurred is a factual question to be determined by the trier of fact," Fleet Bank-NH v. Christy's Table, 141 N.H. 285, 288, 681 A.2d 646 (1996), as is the issue of whether a valid contract was created, Gulf Ins. Co. v. AMSCO, 153 N.H. 28, 43, 889 A.2d 1040 (2005). Accordingly, on these issues, "we will sustain a trial court's findings and conclusions unless they are lacking in evidentiary support or tainted by an error of law." Syncom Indus., 155 N.H. at 82, 920 A.2d 1178.
In this case, after considering all of the evidence  including Chocorua's assertion that it would have requested that additional terms be incorporated into the contemplated right of first refusal contract  the trial court concluded that the Agreement "encompassed the rights and obligations placed on each respective party" and represented "a `meeting of the minds' as to the subject first refusal right(s)." There is ample evidence in the record to support this conclusion. See 17A Am.Jur.2d Contracts § 57 (2004) ("Courts liberally find right-of-first refusal clauses to be specific enough to be enforced, even if they are missing some important terms."). First, the Agreement contains a description of the property affected by the rights of first refusal. Second, the Agreement contains provisions describing the nature of the right of first refusal  that is, a covenant against the Masonian lots  and the period of time in which the rights would remain in effect  that is, a period of twenty years, extendable to eighty years upon Glick's election. Third, as noted above, the Agreement also contains language describing, in detail, how the rights *704 would be triggered and how they would be exercised. And finally, despite the fact that the parties contemplated the execution of a separate first refusal document, the Agreement explicitly states that "all obligations and rights under this [A]greement shall survive the delivery of the deeds contemplated in th[e] Agreement."
Chocorua's argument that the trial court erred in finding that the Agreement created a first refusal contract appears to be premised upon an erroneous reading of the trial court's order. Despite Chocorua's assertions to the contrary, the trial court did not find that the Agreement failed to "contain all terms that the parties regarded as material to rights of first refusal." (Emphasis added.) Rather, the court merely found that "the parties did indeed intend to execute a separate document conveying the first refusal right(s)" and that "possibl[y], perhaps probabl[y], . . . additional terms would" have been included in that document. (Emphasis added.) Nothing in this language suggests that the trial court believed that those additional terms were material. See Lower Village Hydroelectric Assoc. v. City of Claremont, 147 N.H. 73, 75, 782 A.2d 897 (2001) (explaining that "[a] written memorandum is sufficient to establish a contract if it demonstrates that the parties have manifested their intent to be bound to the essential terms of a more detailed forthcoming agreement" (emphasis added)). To the contrary, this language, when considered in light of the court's determination that the Agreement "encompassed the rights and obligations placed on each respective party," indicates that the court found the purported additional terms proffered by Chocorua to be minor details. See id. at 76, 782 A.2d 897 (explaining how a contract can exist regardless of whether the parties "contemplated further negotiations of minor details"). Because we disagree with Chocorua's interpretation of the trial court's order, we cannot find that the court erred in holding that the Agreement created "an enforceable contract." Accordingly, we affirm the trial court on this issue.
Reversed in part; affirmed in part; and remanded.
BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.