NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0066


TOWN OF PEMBROKE

v.

TOWN OF ALLENSTOWN

Argued:  February 7, 2018
Opinion Issued:  June 22, 2018


Preti Flaherty Beliveau & Pachios LLP, of Concord (Mark H. Puffer and Gregory L. Silverman on the brief, and Mr. Silverman orally), for the plaintiff.

Drescher & Dokmo, P.A., of Milford (William R. Drescher on the brief and orally), for the defendant.

Donahue, Tucker & Ciandella, PLLC, of Exeter (Sharon Cuddy Somers on the memorandum of law), for the Town of Allenstown Board of Selectmen.


HICKS, J.  This case presents two questions arising out of the operation of the Suncook Wastewater Treatment Facility (the "Facility") in Allenstown. First, under an intermunicipal agreement, must the defendant, Town of Allenstown, share any of the profits generated from septage haulers who discharge their waste at the Facility with the plaintiff, Town of Pembroke?  And

second, after Allenstown used a portion of those profits to increase the Facility's wastewater treatment capacity, must Allenstown allocate any of that increased capacity to Pembroke?  Because we, as did the Superior Court (Nicolosi, J.), answer both questions "no," we affirm.

I

The following facts are drawn from the trial court's order in this case, or are otherwise found in the record.  Prompted by the passage of the Federal Water Pollution Control Act Amendments of 1972, see Pub. L. No. 92-500, 86 Stat. 816 (1972), commonly known today as the Clean Water Act (CWA), Allenstown and Pembroke entered into an intermunicipal agreement to jointly finance, construct, and maintain a wastewater treatment facility — the Facility — on August 6, 1974.  Due to landscape and location considerations, as well as federal regulations dictating that a single town must be identified as a facility's "owner," Allenstown was chosen as the Facility's home and delineated owner-operator.  Through a combination of federal, state, and local funding, with the local portion accounting for approximately 5% — split 65/35 between Pembroke and Allenstown, respectively, based upon population projections — of the total construction cost, the Facility became operational in 1977.  Governed by the 1974 agreement, the towns thereafter contributed to the Facility's operation and maintenance costs over the ensuing years based upon their proportionate use thereof.

In April 2002, the New Hampshire Department of Environmental Services notified Allenstown that the Facility had exceeded 80% of its "flow capacity" and was "within 100,000 gallons per day of [its] total capacity."  When the Facility ultimately reached its capacity a little over three years later in August 2005, a moratorium was placed on permits for new sewer connections.

As a result, the towns began conferring and negotiating over ways to increase the Facility's capacity and how to fund such efforts.  With regard to the latter consideration, Allenstown explored whether the Facility could accept septage from commercial haulers notwithstanding the moratorium.  In time, Allenstown discovered that it could accept septage by only "dewatering" it, which impacted neither the Facility's capacity nor efficiency negatively, and trucking the resulting "solid sludge" off-site along with solid waste from the towns' collection systems.  By allocating the associated expenses against revenues generated thereby, Allenstown ensured that neither town bore the costs of septage processing.  More importantly, by charging septage haulers a "market rate that exceed[ed] the pure cost of processing the septage," Allenstown began generating what Pembroke alleges are "significant profits."

In support of a proposed $15 million upgrade of the Facility to double its capacity, the towns entered into a successor to the 1974 intermunicipal

agreement on November 20, 2006. Section 3.06 of the 2006 agreement, which concerns, in relevant part, allocation of septage processing revenues, provides:

> Revenue received from septage permits and fees by Allenstown shall be used to help offset the costs of septage processing and any excess revenues may be used to offset the costs of operation and maintenance of [the Facility] and/or the upgrade/expansion of [the Facility].

As to the anticipated upgrade of the Facility, Section 4.03 of the 2006 agreement reads, in pertinent part, as follows:

> At the same time the Town of Allenstown approves and appropriates the bonding of the costs for construction of expansions or modifications to the wastewater facilities, that were designed for, or which will be utilized by the Town of Pembroke, Pembroke shall also raise and appropriate it's [sic] proportionate share of the estimated Capital Costs of the facilities, less any previous payments made during the design phase. Payment of Pembroke's proportionate share of the bond repayment shall be made to Allenstown not less than thirty (30) days prior to the date that Allenstown's payment to the bondholder is due.

Following execution of the 2006 agreement, Allenstown placed profits generated from septage processing — "excess septage revenues" — into a fund separate and distinct from the one used to hold revenues received from residents of the two towns. Warrant articles proposing the appropriation of a $15 million bond for the Facility's upgrade failed at Allenstown's 2007 and 2008 town meetings. Pembroke did not propose a similar article during either year, opting instead, according to the testimony of one town official, to wait until Allenstown voters approved and appropriated a bond before seeking the same from its voters.

Allenstown thereafter changed gears and explored a smaller-scale, less expensive upgrade of the Facility — the "BioMag Project" — to increase its total capacity by 1,200 connections. After discussing this option with Pembroke, the towns reached a proposal to equally finance the BioMag Project's $1.55 million cost and share in the increased capacity. This proposal too, however, also failed among Allenstown voters and was not presented at Pembroke's 2009 town meeting.

Following this latest failure, Allenstown expressed to Pembroke that "the only way Allenstown voters will pass a warrant article [to increase the Facility's capacity] is if they don't have to pay for it." Mins. of Allenstown Sewer Comm'n's Spec. Mtg. of 04/08/2009 (available in Appendix to Brief of Town of Pembroke at 109). Consequently, Allenstown officials proposed that

3

Allenstown finance its share of the BioMag Project's cost through a grant from the American Recovery and Reinvestment Act of 2009 (ARRA), see Pub. L. No. 111-5, 123 Stat. 115 (2009). Rejecting this proposal, Pembroke did not suggest an alternative funding scheme and, instead, expressed to Allenstown — as found by the trial court — that "it did not want any part of the BioMag Project."

On June 13, 2009, Allenstown held a special town meeting and proposed to its voters that the town finance the BioMag Project's entire cost with half of the funding coming from an ARRA grant and the other half from excess septage revenues. This warrant article passed, and it appears Allenstown has made exclusive use of the increased capacity since the BioMag Project's installation. In addition to using the funds to finance a portion of the project, Allenstown also started using excess septage revenues in 2012 to pay for repairs to its town collection system and to subsidize its residents' rates. Pembroke protested Allenstown's use of the funds for these purposes to no avail.

The dispute led Pembroke to institute this action for a declaration, in substance, that excess septage revenues are the property of both towns under the 2006 agreement and that it is entitled to a share of the increased capacity created by the BioMag Project. Pembroke also requested damages for the excess septage revenues Allenstown had expended to that point. Allenstown objected and responded, in part, that Pembroke breached the 2006 agreement when it "refus[ed] to participate" in the BioMag project.

At the conclusion of a four-day bench trial, the trial court found that Pembroke breached the 2006 agreement. With regard to excess septage revenues, the trial court concluded that, under both the plain text of Section 3.06 of the 2006 agreement and evidence presented at trial, Allenstown is entitled to expend such funds "however it sees fit." In making this finding, the trial court rejected Pembroke's position that interpreting Section 3.06 in this manner conflicts with CWA regulations governing Allenstown's operation of the Facility. As to the increased capacity, the trial court found, "[b]y refusing to participate in the funding for the BioMag [P]roject," Pembroke breached, in pertinent part, Section 4.03 of the 2006 agreement. Because Allenstown thereafter "fully funded" the BioMag Project, the trial court concluded that Pembroke is not entitled to any portion of the resulting increased capacity.

Pembroke maintains in this appeal that the trial court erred in several respects in reaching these conclusions. We disagree.

II

We begin first by addressing the towns' dispute over excess septage revenues under the 2006 agreement. Because interpretation of a contract is ultimately a question of law for us to decide, we review the trial court's interpretation of that agreement de novo. Birch Broad. v. Capitol Broad. Corp.,

4

161 N.H. 192, 196 (2010). "When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Id. "We give an agreement the meaning intended by the parties when they wrote it." Id.

Consistent with the applicable general rule of contract construction, see 17A Am. Jur. 2d Contracts § 359 (2016); 11 Richard A. Lord, Williston on Contracts § 30:10, at 144 (4th ed. 2012), the towns' 2006 agreement establishes that the word "shall" is "mandatory" in effect, while the word "may" is "permissive" in effect. Section 3.06 of the agreement provides that Allenstown "shall" use septage revenues to offset the costs of septage processing, while it "may" use any excess to offset the costs of the Facility's operation and maintenance or upgrade or expansion. Accordingly, by its terms, Section 3.06 makes Allenstown's allocation of septage revenues mandatory in the first instance, but permissive in the second. That is, although obligated to first offset the cost of septage processing with the revenues, the decision whether to allocate the excess to other Facility-related costs, or seemingly anywhere else, lies within Allenstown's sole discretion — or, as the trial court put it, Allenstown may use the excess "however it sees fit."

Pembroke, however, offers an alternative reading of Section 3.06, in which other provisions of the 2006 agreement operate to require Allenstown to use excess septage revenues to benefit both towns. Noting correctly that it has long been our practice to focus upon the intent of the parties, as manifested in the language of the entire agreement, when defining parties' respective rights under the terms of a contract, Glick v. Chocorua Forestlands Ltd. P'ship, 157 N.H. 240, 247 (2008), Pembroke draws our attention to several provisions throughout the agreement embodying what it entitles the "principles of proportionality." Pembroke maintains that these provisions stand upon "the basic principle . . . that users of a wastewater treatment facility pay proportionately for the facilities that they use," which principle, it argues, is violated if Section 3.06 is interpreted as above. It therefore concludes that Section 3.06 must be read as requiring Allenstown to use excess septage revenues to proportionately reduce both towns' wastewater treatment-related costs, and not only its own.

But the "proportionality" provisions Pembroke relies upon require only that both Allenstown and Pembroke pay for their proportionate share of the Facility's total operating costs. And nowhere does Pembroke argue that Allenstown is not ultimately fulfilling this obligation. Neither the text of the cited provisions, nor, more importantly, Section 3.06, can be read to obligate Allenstown to allocate any excess septage revenues to Pembroke's Facility-related costs.

Nor can Section 3.06 be read, as Pembroke also argues, to circumscribe Allenstown's authority over allocation of excess septage revenues to the two options identified: offsetting the costs of the Facility's "operation and maintenance" and/or its "upgrade/expansion." While Section 3.06 may indeed identify two options, neither that provision, nor any other provision in the agreement, limits Allenstown's discretion to those choices. Ironically, Pembroke's reading, and not that of Allenstown or the trial court as it contends, would in fact require us to add to or modify Section 3.06's text to reach the claimed intent of the parties — e.g., "any excess revenues may [only] be used to . . . ." Yet, it is our duty and function to interpret and enforce the agreement the towns reached, not to add to the agreement or take from it. See Technical Aid Corp. v. Allen, 134 N.H. 1, 21 (1991).

Faced with this outcome under Section 3.06's plain text, Pembroke urges us next to look beyond the provision's language to the evidence it presented at trial, such as: (1) the history of the towns' obligations towards the Facility; (2) testimony of Pembroke officials involved in the 2006 agreement negotiations, including what they understood the meaning of the word "may" in Section 3.06 to entail; and (3) the towns' conduct following execution of the 2006 agreement. According to Pembroke, this evidence reveals it was never the towns' intent to allow Allenstown to spend excess septage revenues "however it sees fit."

Absent ambiguity, however, the towns' intent must be determined from the plain meaning of the language used in the 2006 agreement. See Birch Broad., 161 N.H. at 196. Pembroke does not explicitly argue that Section 3.06 is ambiguous, nor would we be inclined to find as much in light of the defects in Pembroke's proffered readings of the provision. Behrens v. S.P. Constr. Co., 153 N.H. 498, 503 (2006) ("A clause of an agreement is ambiguous when the contracting parties reasonably differ as to its meaning." (emphasis added)). It may be true that Pembroke desired excess septage revenues to benefit both towns, and that it entered into the agreement with that belief. It is axiomatic, though, that "[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." Mills v. Nashua Fed. Sav's and Loan Assoc., 121 N.H. 722, 726 (1981); see 11 Williston on Contracts, supra § 31:5, at 479-80 ("[A] court cannot change the words of a written contract so as to make it express the claimed real intention of one or the other of the parties, or remake a contract to implement an alleged but unexpressed intention, if doing so would contradict the clearly expressed language of the contract." (footnotes omitted)). Because the plain text of Section 3.06 confers on Allenstown unfettered discretion over allocation of excess septage revenues, we decline to consider whether the evidence of intent presented at trial paints a different picture.

In a final effort to avoid the outcome compelled by the language of the 2006 agreement, Pembroke appeals to one of the many CWA regulations governing Allenstown's operation of the Facility, 40 C.F.R § 35.2140 (2017). This regulation requires Allenstown, as the Facility's owner and operator, to implement and administer a "user charge system" — generally speaking, a system under which each "user" of a wastewater treatment facility is charged for their proportionate contribution to that facility's total operating and maintenance costs, including replacement. 40 C.F.R § 35.2140; see 40 C.F.R. § 35.2005(b)(52) (2017).

Observing that Allenstown agreed to comply with this, and several other, CWA regulations in the 2006 agreement, Pembroke points out that 40 C.F.R. § 35.2140's user charge system requirements "take precedence over any terms or conditions of agreements or contracts which are inconsistent" therewith. 40 C.F.R. § 35.2140(h) (2017). Such an inconsistency would result under one of those requirements, 40 C.F.R. § 35.2140(f) (2017), Pembroke argues, if we interpret Section 3.06 as we do above. 40 C.F.R. § 35.2140(f) directs that:

> After completion of building a [publicly owned treatment works], revenue from the [publicly owned treatment works] (e.g., sale of a treatment-related by-product; lease of the land; or sale of crops grown on the land purchased under the grant agreement) shall be used to offset the costs of operation and maintenance. The grantee shall proportionately reduce all user charges.

See 40 C.F.R. § 35.2005(b)(8), (32) (2017). Arguing that excess septage revenues are "revenue from the [publicly owned treatment works]" (i.e., "revenue from" the Facility), Pembroke insists once more that either Section 3.06 must be read to require Allenstown to use the revenues to proportionately reduce both towns' user charges, or it is inconsistent with the CWA and, thus, 40 C.F.R. § 35.2140(f) nevertheless controls. This argument, too, however, is unavailing.

The maxim ejusdem generis provides that, when specific words in a statute or regulation follow general ones, the general words are construed to embrace only objects similar in nature to those enumerated by the specific words. See Dolbeare v. City of Laconia, 168 N.H. 52, 55 (2015) (applying maxim in statutory interpretation); Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 163-64 (2012) (applying maxim in regulatory interpretation). The examples listed after the phrase "revenue from the [publicly owned treatment works]" indicate to us that it is only those revenues generated by a wastewater utility from non-wastewater treatment related ventures — e.g., a wastewater utility leasing an unused field located on its property to a local school — that must be used to proportionately reduce all user charges. Militating in favor of our construction is a section of the "User Charge Guidance Manual" cited by Pembroke in support of its view to the contrary,

which provides that "[s]econdary revenue offsets are generated by a wastewater utility from activities <u>other</u> <u>than</u> the provision of wastewater treatment services." Envtl. Prot. Agency, <u>User Charge Guidance Manual For Publicly-Owned Treatment Works</u> ("Guidance Manual") 10 (1984) (emphasis omitted and emphasis added); <u>see</u> <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000) (observing that agency interpretations contained in, in relevant part, "agency manuals" are "entitled to respect" only "to the extent that those interpretations have the power to persuade") (quotations omitted).

Septage revenues, by contrast, are revenues Allenstown generates from the Facility's very purpose and function. These revenues, therefore, are identical to those Allenstown and Pembroke pay for their respective use of the Facility. <u>Id</u>. at 25 (defining a "[u]ser" as "[a] recipient of wastewater treatment services" and a "[u]ser charge" as "[a] charge levied on users of a treatment works for the cost of operation and maintenance, including replacement" (bolding omitted)). The only difference is, as Pembroke observes, "Allenstown does not charge septage haulers only the amount necessary to account for [the Facility's] operation, maintenance, and replacement costs," but rather makes a substantial profit by "invoic[ing] septage haulers what the market will bear."

Pembroke responds that, if the foregoing is true and "septage haulers are users [of the Facility], just as Pembroke and Allenstown are users" as the trial court found, then Allenstown should not be deriving a profit from the haulers, but only payment for their proportionate contribution to the Facility's operating costs under the user charge system. On the surface, this argument has some appeal. <u>See</u> <u>id</u>. at 9 ("[T]he goal of a publicly owned wastewater utility is to recover its costs, not to make a profit."). The narrow question before us, however, is whether Pembroke is entitled to share in the excess septage revenues under the 2006 agreement. Having determined that the agreement entitles Allenstown to use those funds within its discretion, we answer that question in the negative.

III

Turning to the second question presented in this appeal, our conclusion above is largely dispositive. Operating under the supposition that it is entitled to a share of the excess septage revenues, Pembroke argues that it is, therefore, also entitled to share in the increased capacity created by the BioMag Project given that the installation was partially funded by those revenues. This argument necessarily fails given our decision above. Nor is Pembroke entitled to the relief it seeks simply because Allenstown used an ARRA grant to fund the project's remaining construction costs. Other than another invocation of the CWA's "proportionality requirements," Pembroke points us to no specific regulation or statute either prohibiting Allenstown, as the Facility's owner-operator, from individually benefitting from such a grant or conferring on Pembroke, as a "user," the right it asserts.

8

It also does not follow, as Pembroke argues, that it is entitled to share in the increased capacity simply because, under the 2006 agreement, Allenstown could have required it to "pay its proportionate share of any costs [of the BioMag Project's installation costs] not funded with Federal grants or with profits from septage haulers." As found by the trial court, in the face of Pembroke's position that "it did not want any part of the BioMag Project" despite its contractual obligations, Allenstown "moved forward on its own" and found the funds necessary to complete the project. See O'Malley v. Little, 170 N.H. 272, 275 (2017) (noting that, in reviewing a trial court's decision rendered after a trial on the merits, "we defer to [its] judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence" (quotation omitted)); see also 23 Richard A. Lord, Williston on Contracts § 63:52, at 654 (4th ed. 2002) (observing that, under the doctrine of anticipatory repudiation, "if the nonrepudiating party wishes only to refrain from performing its part of the contract . . . [it] ordinarily need do nothing except refrain from performing and from receiving performance until it sues or is sued, at which time, the excuse may be pleaded" (footnote omitted)). Allocation of the resulting increased capacity, therefore, is Allenstown's to determine.

Consequently, although Pembroke's frustration is understandable given its contributions to the Facility's operation and maintenance costs over the past four decades, we conclude, as did the trial court, that it is not entitled to a share of the increased capacity under the arguments advanced. We therefore affirm the trial court's finding on this issue as well.

Affirmed.

LYNN, C.J., and BASSETT and HANTZ MARCONI, JJ., concurred.

9