**Tesfaye MAMO, Appellant,**

v.

**Alan and Anexora SKVIRSKY and Samuel Teklu, Appellees.**

No. 06–CV–306.

District of Columbia Court of Appeals.

Argued May 1, 2007.

Decided Nov. 20, 2008.

---

Quinn O'Connell, Jr., with Desiree C. Hensley was on the brief, for appellant.

Steven Sarfatti, Washington, for appellees Alan & Anexora Skvirsky.

Ziad P. Haddad, with whom David C. Tobin was on the brief, Washington, for appellee Samuel Teklu.

Before REID and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

This is an appeal from an award of summary judgment in a dispute over a commercial tenant's right to purchase his landlord's building. The dispute centers on the meaning of a provision in the lease entitling the tenant to "match" third-party offers for the building. The question is whether the provision grants the tenant what is known as a "right of first refusal," requiring the landlord to sell to the tenant if the landlord accepts an offer submitted by another party and the tenant then matches it. In rendering judgment for the landlord as a matter of law, the trial court concluded otherwise and ruled that the lease provision unambiguously allows the landlord to reject the tenant's matching offer if the other party enhances his competing bid.

We disagree with the trial court. In our view, the lease provision is ambiguous and reasonably may be construed as granting the tenant a right of first refusal. Consequently, in the absence of extrinsic evidence eliminating the ambiguity, the parties' dispute over the meaning of the provision is not amenable to resolution by summary judgment. The judgment for the landlord must be vacated.

## I.

The object of contention in this appeal is a three-story Adams Morgan row house formerly owned by appellees Alan and Anexora Skvirsky. In December 2003, the Skvirskys leased basement space in the row house to appellant Tesfaye Mamo for his retail music store, "EthioSound." The Skvirskys previously had leased the upper floors of the building to another commercial tenant, known as Technical Assistance & Training Corporation or "TATC." Paragraph 23 of each lease granted the "Tenant" (i.e., Mamo or TATC) certain rights in the event the "Landlord" (i.e., the Skvirskys) decided to sell the building or received an offer from a third party to purchase the building. Those rights are

described in the paragraph's heading as a "right to negotiate purchase" and a "right to match purchase offer." Under that heading, Paragraph 23 states in pertinent part as follows:

Should Landlord decide to sell the building, Landlord shall give Tenant written notice to that effect, and Tenant shall have thirty (30) days to reach agreement with Landlord as to the terms for Tenant to purchase the building. Should Landlord receive an offer from another party to purchase the building, Tenant shall have five (5) days to match that offer, but no less than thirty (30) days from Landlord's initial notice to Tenant of its intent to sell the building.

The eventuality covered by Paragraph 23 came to pass some eighteen months later. Appellee Samuel Teklu contacted the Skvirskys and expressed interest in buying their building. On July 6, 2005, the Skvirskys and Teklu reached an agreement and executed a contract of sale. Teklu agreed to pay $1.15 million and to make an earnest money deposit of $50,000. It appears that the Skvirskys initially overlooked their obligations to their tenants under Paragraph 23. After examining the leases, Teklu brought that paragraph to the Skvirskys' attention, and the parties amended their contract on July 19 to state that the sale to Teklu was "subject" to Mamo's and TATC's "rights to purchase the property." At about the same time, the Skvirskys notified Mamo and TATC of their intent to sell the building. Mamo declared his interest in buying it himself, while TATC disclaimed any interest. Accordingly, on August 1, the Skvirskys furnished Mamo a purported copy of their July 6 contract with Teklu

(without including the July 19 amendment). For whatever reason, however, the document given to Mamo misstated the agreed-upon purchase price as $1.2 million.[1]

On August 9, Mamo tendered a competing contract to the Skvirskys for their signatures, along with the required $50,000 deposit. Mamo's contract matched the terms of the Skvirskys' July 6 contract with Teklu, except that Mamo committed to pay $1.2 million instead of $1.15 million.

The Skvirskys refused to sign the contract Mamo delivered to them on August 9. Instead, they informed Mamo the following day that they had executed two amendments of their agreement with Teklu. The amendments, dated August 8 and 10, increased Teklu's purchase price to $1.25 million and his required deposit to $150,000. These changes were followed by a further amendment on August 11 increasing the deposit to $400,000. On August 24, the Skvirskys formally notified Mamo that he would have to match the terms of the amended contract, which supposedly represented Teklu's "final offer," in order to acquire the Adams Morgan property. Mamo declined to do so, maintaining that Paragraph 23 of his lease obligated the Skvirskys to sell him the building on the terms he had met on August 9.

Faced with Mamo's and Teklu's conflicting demands to buy their building, the Skvirskys presented Teklu with an ultimatum: either terminate his contract or indemnify them against Mamo's claims. Rather than agree to that choice, Teklu sued the Skvirskys in Superior Court, alleging anticipatory breach of contract and

1. To be precise, it appears from the exhibit contained in the record on appeal that the document given Mamo stated the purchase price as "One Million One Hundred Fifty Thousand Dollars ($1,200,000.00)." Mamo

accuses the Skvirskys of having fraudulently (if clumsily) altered the contract, which the Skvirskys deny. The trial court did not resolve this dispute, and it is immaterial to the issues before us in this appeal.

seeking specific performance. Mamo was permitted to intervene in the action with his own complaint against the Skvirskys, in which he asked the court to enforce his rights under Paragraph 23 of his lease by ordering the Skvirskys to sell their building to him on the terms of his matching August 9 contract. In due course, the parties to the resulting three-way action filed motions to dismiss or for summary judgment.

After hearing the parties' arguments, the trial court granted summary judgment to the Skvirskys on Mamo's complaint. The court ruled that Paragraph 23 unambiguously allowed the Skvirskys to entertain Teklu's improved offers so long as they gave Mamo the chance to meet them (which they did). Because Mamo "failed to match any of the new and materially different terms of Teklu's amended offers," the court concluded, he had no right to compel the Skvirskys to sell to him.

■ Immediately following the entry of judgment against Mamo, the Skvirskys and Teklu voluntarily dismissed their complaints against each other and closed on the sale of the building. Mamo's motions to set aside or stay execution of the judgment against him and to enjoin the sale were denied. This appeal followed.[2]

## II.

■ Our review of the trial court's award is de novo: summary judgment may be granted only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] Where, as here, the dispute hinges on the interpretation of a contract, we have said that summary judgment is appropriate if the contract is unambiguous, because in the absence of ambiguity, "a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence."[4] However, if the contract is ambiguous, its proper interpretation requires consideration of extrinsic evidence, which precludes summary judgment unless the probative evidence marshaled by the movant eliminates any genuine dispute about what a reasonable person in the position of the parties would have thought the contract means.[5]

■ In awarding summary judgment to the Skvirskys, the trial court construed Paragraph 23 of Mamo's lease without relying on extrinsic evidence to elucidate its meaning. Thus, the threshold question we must decide is whether Paragraph 23 is indeed unambiguous, as the trial court held. The test we employ is an objective one: a contract is ambiguous if it is "rea-

2. We are not persuaded by appellees' contentions that the post-judgment consummation of the Skvirskys' sale to Teklu has rendered Mamo's appeal moot. As a party to the litigation, Teklu was well aware of Mamo's claim on the Skvirskys' property, and therefore Teklu was not a bona fide purchaser. See Clay Props., Inc. v. Washington Post Co., 604 A.2d 890, 898 (D.C.1992); see also Wilson Courts Tenants Ass'n, Inc. v. 523–525 Mellon St., LLC, 924 A.2d 289, 295 (D.C.2007). But even if the sale to Teklu is not subject to rescission at this point—an issue we do not reach—we see no reason why Mamo would be precluded on remand from amending his complaint to

seek damages (or other relief) in lieu of specific performance.

3. SUPER. CT. CIV. R. 56 (c); see, e.g., Tauber v. Quan, 938 A.2d 724, 729 (D.C.2007).

4. Holland v. Hannan, 456 A.2d 807, 815 (D.C. 1983).

5. See Tillery v. District of Columbia Contract Appeals Bd., 912 A.2d 1169, 1176 (D.C.2006); see also Howard Univ. v. Best, 484 A.2d 958, 966 (D.C.1984) ("[I]f a contract is ambiguous, and the evidence supports more than one reasonable interpretation, the interpretation is a question of fact for the jury.").

sonably or fairly susceptible" of more than one materially different interpretation.[6] "[W]e examine the document on its face, giving the language used its plain meaning, unless, in context, it is evident that the terms used have a technical or specialized meaning."[7]

The focal point of the parties' disagreement is the right granted Mamo in Paragraph 23 to "match" third-party offers to purchase the Skvirskys' building. We need to consider the possible implications of that right. Appellees contend it implies only that the Skvirskys cannot accept a third party's offer if Mamo matches it:

> A right to match simply means that the landlord cannot sell to the third-party at the price and terms matched by the tenant. If the third-party enhances his offers, the tenant retains his right to match those enhanced terms and, once the third-party makes a final offer that is both acceptable to the landlord and matched by the tenant, the tenant has perfected his paragraph 23 rights and is entitled to contract for the Property.[8]

Because "Paragraph 23 does not distinguish between third-party offers that have been accepted by the [landlord] ... and those that have not,"[9] appellees construe it to mean that the landlord remains free to entertain and accept a third party's improved offer even after the landlord has accepted a previous offer from that party and the tenant has matched that offer. The trial court agreed with this interpretation. It is not an unreasonable one.

▮▮▮▮ Nonetheless, Mamo argues that the right to match carries with it a further implication-that once the landlord accepts an offer from a third party, the landlord is bound to accept the tenant's matching offer as well. In other words, Mamo reads Paragraph 23 as granting him what is commonly called a "right of first refusal"— a "preemptive right" that becomes an option to buy "when the grantor decides to sell on the terms offered by a third party."[10] The holder of a right of first refusal is entitled to "be given an option to purchase *before* [the grantor] makes a contract to sell to another."[11] "It is a violation of duty for [the grantor] to make a contract to sell [to a third party] on any terms, even though the contract is expressly made 'subject to' the right of [the

---

**6.** *Holland*, 456 A.2d at 815 (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973) (internal quotation marks omitted)).

**7.** *Beck v. Cont'l Cas. Co. (In re May)*, 936 A.2d 747, 751 (D.C.2007) (internal quotation marks and citation omitted).

**8.** Brief of Appellees (Skvirskys) at 30–31.

**9.** Brief of Appellee (Teklu) at 16.

**10.** *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 (7th Cir.1996). To elaborate:

> The holder of a right of first refusal on a piece of land only has the right to receive an offer to buy the land. Generally, it is a contractual right to preempt another because the right is conditional on the owner's decision that an offer from a third party is acceptable. More specifically, the right is subject to an agreed condition precedent, typically the owner's receipt of an offer from a third party and the owner's good-faith decision to accept it. Only then can the holder of the right decide whether or not to create a contract on the same terms that the owner is willing to accept from the third party. More precisely, the occurrence of these events (owner's receipt of an offer and the good-faith decision to accept it) satisfies the condition precedent, which "triggers" the right of first refusal that "ripens" into an option. The option then can be exercised like any other option contract.
> 3 ERIC MILLS HOLMES, CORBIN ON CONTRACTS § 11.3, at 470–71 (Rev. ed.1996) [hereinafter CORBIN] (footnotes omitted).

**11.** CORBIN, *supra* note 10, § 11.3, at 479 (emphasis added).

holder]." [12]  The grantor's wrongful acceptance of a third party's offer "has the effect of an offer to sell to" the holder of the right of first refusal, giving the holder "a power of acceptance;" "and if [the holder] gives notice of acceptance [he] consummates a contract to sell on the terms offered by [the third party] and accepted by [the grantor]." [13]

■ We think that Paragraph 23 is "reasonably or fairly susceptible" of the interpretation Mamo advances. It is true, as appellees emphasize, that the paragraph does not explicitly grant Mamo the right to buy if the Skvirskys accept a third party's offer.[14] Neither, however, does Paragraph 23 spell out the right to block the Skvirskys from accepting such an offer, which is a right the paragraph admittedly conveyed. According to Professor Corbin's treatise, "[i]t is unlikely that any right of first refusal would not include the right of the holder to buy when the grantor had

actually negotiated a sales contract with someone else. Still the right is usually left to implication, not expressed." [15]

The implication of a right to buy on the terms accepted from a third party is a plausible one here. Mamo's conceded right to match and thereby block third-party offers existed not for its own sake, but to enable Mamo to buy the Skvirskys' building himself when they were prepared to sell it.[16] The Skvirskys' decision to grant Mamo the right to match in his lease presumably signified their unqualified willingness to sell to him on whatever terms they would accept from another party. Thus, the Skvirskys' notification to Mamo of their actual acceptance of a third party's terms (which occurred when they informed Mamo of their fully-executed July 6, 2005, sales contract with Teklu) reasonably could be viewed as an offer by the Skvirskys to Mamo to sell the building to him on equal terms.[17] If so, Mamo clearly accepted that

12. *Id.* at 480.

13. *Id.; see, e.g., Beavers Serv., Inc. v. Norris,* 470 A.2d 312, 315 (D.C.1983) (holding that once grantor of right of first refusal executed a binding contract with a third party, "he was obliged to sell" to the holder of the right on the same terms, and "could no longer refuse to sell the property"). (The example given above assumes that the inchoate option is to buy on the same terms as the grantor accepts from a third party. That is what rights of first refusal usually provide, but other options are sometimes specified, such as a right to buy at a market value set by an independent appraisal. *See Holland,* 456 A.2d at 809–10.)

14. *Cf. Beavers Serv.,* 470 A.2d at 313 (lessee had the express "right to purchase ... for the same price and terms" of a third-party offer "acceptable to" the lessor); *Holland,* 456 A.2d at 810 n. 3 (lessee had an express "option" to purchase at an appraised fair market value in the event lessors "determine to dispose" of property).

15. CORBIN, *supra* note 10, § 11.4, at 492–93. *See, e.g., Miller,* 87 F.3d at 225 (describing right "to 'match' an offer to purchase the

station 'upon the exact terms and conditions as contained in the offer' " as a right of first refusal); *Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.,* 2006 WL 1147933, at *1, 2006 U.S. Dist. LEXIS 24510, at *3 (D.D.C. Apr. 28, 2006), *aff'd,* 2006 U.S.App. LEXIS 28692 (D.C.Cir. Nov. 17, 2006) (finding right of first refusal in right "to elect to meet" an acceptable offer submitted by a third party).

16. *See* David I. Walker, *Rethinking Rights of First Refusal,* 5 Stan. J.L. Bus. & Fin 1, 47 (1999) (discussing rationale of commercial tenant to bargain for right of first refusal).

17. *See Glick v. Chocorua Forestlands Ltd. P'ship,* 157 N.H. 240, 949 A.2d 693, 701 (2008) (enforcing right of first refusal where holder's option to purchase, activated by grantor's agreement to sell to third party, was not conditioned on the "continued existence" of that agreement); *see also Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 805 N.E.2d 957, 963 (2004) (stating that third-party offer triggers right of first refusal if made with genuine intent to be bound by the offer's terms).

offer (by submitting a matching contract and tendering the required deposit) before it was withdrawn or modified.[18] Offer and acceptance result in a binding contract.

It might be argued that, on its face, Paragraph 23 expressly grants Mamo only a limited right to negotiate and attempt to "reach agreement" with the Skvirskys in the event they should "decide to sell the building." *Expressio unius est exclusio alterius.*[19] But the recognition of Mamo's right to negotiate terms himself is not inconsistent with construing his right to match as entailing a right to the benefit of any terms negotiated by others. The two entitlements reasonably may be viewed as complementary, their applicability depending on whether the Skvirskys receive an acceptable offer from Mamo or from another party.[20]

Because we conclude that Paragraph 23 is reasonably susceptible of Mamo's interpretation, we are constrained to hold that the trial court erred in finding the provision unambiguous. Furthermore, the court was not presented with extrinsic evidence sufficient to eliminate the ambiguity. The Skvirskys argue that the right to match third-party offers should not be construed as a right of first refusal because they granted the same right to their other tenant, TATC. At least at the summary judgment stage, this argument is not persuasive. For one thing, there is no evidence (and the Skvirskys do not claim) that Mamo knew of the corresponding right to match in TATC's lease. Its existence consequently says nothing about how a reasonable person in Mamo's shoes would have understood the terms of his lease. In addition, there is no incongruity in granting a right of first refusal to both tenants, for the Skvirskys would still be able to honor those rights simply by negotiating with each tenant equally and in good faith before making or accepting any offer. A problem would arise only if the Skvirskys were to breach that contractual obligation.

We vacate the award of summary judgment to the Skvirskys on Mamo's complaint and remand for further proceedings.

---

**18.** We assume for the sake of argument that the Skvirskys could have withdrawn or modified their offer to Mamo *before* he accepted it by informing him (truthfully, of course) that their contract with Teklu had been abandoned or amended. *See LIN Broad. Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 544 N.Y.S.2d 316, 542 N.E.2d 629, 634 (1989); *cf. Glick*, 949 A.2d at 698–702.

**19.** A maxim meaning that the mention of one thing implies the exclusion of another. *See McCray v. McGee*, 504 A.2d 1128, 1130 (D.C. 1986).

**20.** Paragraph 23 appears to equate a "decision to sell" with an "intent to sell." It clearly envisions that the decision will precede the actual negotiation of specific terms of sale. Beyond that, we need not try to define the words. *Cf. Holland*, 456 A.2d at 810 (construing the words "determine to sell" as requiring an "unequivocal decision to transfer rights in property to another for consideration," but not necessarily a firm offer or acceptance of specific terms).