Bryan SCOTT, Appellant,

v.

**UNITED STATES, Appellee.**

**Lloyd Patterson, Appellant,**

v.

**United States, Appellee.**

**Nos. 05–CF–374, 05–CF–460.**

District of Columbia Court of Appeals.

Argued Feb. 25, 2009.
Decided July 9, 2009.

Shilpa S. Satoskar, Public Defender Service, with whom James Klein and Corinne Beckwith, Public Defender Service, were on the brief for appellant Bryan Scott.

Mindy A. Daniels, appointed by the court, for appellant Lloyd Patterson.

John P. Gidez, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, and Steven B. Snyder, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Lloyd Patterson and Bryan Scott appeal their convictions arising out of an alleged assault. Both Patterson and Scott were convicted of assault with a dangerous weapon ("ADW");[1] possession of a firearm during a crime of violence ("PFCV");[2] carrying a pistol without a license ("CPWL");[3] possession of an unregistered firearm ("UF");[4] and unlawful possession of ammunition ("UA").[5] Patterson only was also convicted of a second ADW; assaulting, resisting, or interfering with a police officer with a dangerous weapon ("APOWA");[6] and a second count of PFCV for the separate APOWA. Patterson argues that there was insufficient evidence to support his convictions for the assault against the police officer. Scott argues that the trial court committed error of constitutional dimension in prohibiting

1. D.C.Code § 22–402 (2001).

2. D.C.Code § 22–4504(b) (2001).

3. D.C.Code § 22–4504(a) (2001).

4. D.C.Code § 7–2502.01 (2001).

5. D.C.Code § 7–2506.01(3) (2001).

6. D.C.Code § 22–405(b) (2001).

the admission of cellular telephone records that supported the only defense theory he attempted to raise. We affirm Patterson's convictions, but vacate Scott's conviction for ADW and the related PFCV conviction, and remand those charges for further proceedings.

## FACTUAL SUMMARY

At approximately 1:00 a.m. on January 16, 2004, Barry Tyson was shot in the back near the entrance of an apartment building located at 4321 3rd Street, in Southeast Washington, D.C. Tyson testified that two men wearing masks walked past him as he waited for a taxi in front of the building. The men then returned and accosted him. The taller of the pair, wearing a grey sweatshirt, pulled a pistol and shot Tyson in his back as he fled into the building. The shooter was later identified as Lloyd Patterson.

Two undercover Metropolitan Police Department ("MPD") officers happened to witness the shooting. Officers Stephenson and Wallace were in the area in street clothes, in an unmarked car, conducting undercover operations against narcotics traffickers.

Officer Stephenson testified that he saw three men take part, rather than two. The tallest man was Patterson, and one of the shorter men, wearing a dark outfit, was Bryan Scott. The third man was wearing a white windbreaker. Stephenson testified that as he was about to exit the vehicle, he saw Patterson fire a weapon as Tyson ran inside the building. Stephenson also observed Scott with a weapon in his hand, but was unsure whether he fired any shots. After the shots were fired, according to Stephenson, the trio fled from the building to the street. The unidentified man got in a car and drove away, while Patterson and Scott fled on foot.

Officer Wallace gave a slightly different account of the shooting. She saw only two men approach Tyson. Both men pulled weapons on Tyson and began shooting. Immediately after the shooting, both men fled on foot. As they ran in front of the unmarked police vehicle, Wallace saw their faces and was able to broadcast a lookout for the pair. Wallace later identified both Patterson and Scott in court.

Scott and Patterson ran into the street directly in front of the unmarked police car occupied by Stephenson and Wallace. Stephenson saw Patterson point his weapon at the officers. Stephenson then slammed on the brakes of the slowly moving vehicle while he and Wallace ducked down. As the two men ran away, Stephenson exited the vehicle and repeatedly shouted, "Drop the gun, police"! Wallace testified that Stephenson yelled, "Stop, police"! to the men, and she yelled, "Police! Stop! Put your hands up"! The two men fled in between some nearby buildings. As Stephenson exited the vehicle, Patterson again turned his pistol on the officer. Stephenson fired at Patterson, but missed.

Officer Stephenson pursued Patterson and Scott into an alley. As he gave chase, he observed Patterson discard his pistol. He also observed Scott tuck something into his waistband. After turning the corner of a building, Stephenson encountered Patterson and Scott, who had been apprehended by uniformed MPD officers in response to Wallace's radio call. Both pursuing officers identified the two men as the persons who had assaulted Tyson in front of the apartment building.

Patterson directed police to his discarded weapon, a black .45 caliber pistol, which crime scene technicians later determined was fired several times around the front of the apartment building. Another weapon, a silver .38 caliber revolver, thought to be Scott's, was also recovered by police in

some nearby bushes. Crime scene technicians could not determine whether Scott's revolver had been fired. Neither of the weapons had adequate fingerprint markings to be compared with the known matches for Patterson and Scott in the MPD's fingerprint database. MPD officers also took a cellular telephone from Scott.

At trial, Scott's defense was that he was a bystander at the shooting, rather than a participant. He called as a witness Kimberly Barnes, a family friend whose son was a friend of Scott. Scott's claim of constitutional error arises out of her testimony. Ms. Barnes testified that she made six telephone calls from her home telephone to Scott's cellular telephone just prior to, during, and after the assault on Tyson. Ms. Barnes testified she made those calls because she was attempting to locate her son. In the first call, just after midnight, Ms. Barnes testified that Scott sounded normal and they spoke briefly. In the second call, Scott sounded fine, but then he exclaimed that someone was shooting. Ms. Barnes testified she heard noises like firecrackers in the background before the telephone went dead. When Ms. Barnes called Scott again, he answered, but was out of breath and said he would return her call, but the call again ended because of a lost signal. Another call was placed from Ms. Barnes to Scott, with the same conversation and the same result. Ms. Barnes testified that she placed two more calls to Scott, but did not reach him.

The government attacked Ms. Barnes's credibility by offering evidence of a large number of past convictions for various crimes of dishonesty. At the time of trial, Ms. Barnes was serving an eighteen-month sentence at the Prince George's County Detention Center for theft. By way of cross-examination, the jury learned that Ms. Barnes had five prior convictions for theft, three convictions for failure to appear, two convictions for uttering or passing false documents, and single convictions for concealment of merchandise, larceny by false pretense, altering a United States treasury check, and making fraudulent demands against the United States.

Scott sought to introduce cellular telephone records relating to "Debra Scott" to corroborate Ms. Barnes's testimony. The government objected to their introduction on several grounds: (1) the records did not show that appellant Scott was actually speaking on the telephone with Ms. Barnes; (2) although the records indicated the duration of the calls in seconds, they do not, by themselves, indicate whether a call was connected or merely was directed to voice mail; (3) an expert witness would be required to address the foregoing objection; and (4) the records were merely cumulative evidence of Ms. Barnes's testimony. The trial court indicated it was willing to admit the records if the government would stipulate that the incoming calls from Ms. Barnes were to the cellular telephone recovered from Scott during his arrest. However, the government refused to do so and the records were not admitted.

The jury convicted Patterson of two counts of ADW, one count of APOWA, two counts of PFCV, and one count each of CPWL, UF, and UA. He received a sentence of a total of 192 months' incarceration. Scott was convicted of ADW, PFCV, CPWL, UF, and UA. He was sentenced to a total of seventy-eight months' incarceration. Their timely appeals were filed and consolidated.

## I.

*Patterson's Sufficiency Challenge to APOWA Conviction*

Appellant Patterson argues that the evidence was insufficient to sustain his

conviction for APOWA. In considering a claim of insufficiency, we review the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of witnesses and draw reasonable inferences from the testimony, *see Jeffrey v. United States,* 892 A.2d 1122, 1130 (D.C.2006); *Jones v. United States,* 743 A.2d 1222, 1224 (D.C.2000), and draw no distinction between direct and circumstantial evidence. *See In re CA. S.,* 828 A.2d 184, 188 (D.C.2003). To convict Patterson of APO, the government was required to prove that he (1) committed an assault, (2) using a dangerous weapon, (3) against a victim the defendant either knew or should have known was a police officer engaged in official duties. *See Rivera v. United States,* 941 A.2d 434, 440 (D.C. 2008); *Parks v. United States,* 627 A.2d 1, 4 (D.C.1993). Patterson argues that because the undercover officers were in plain clothes, and there was no evidence that Patterson actually "heard" or "should have heard" their verbal commands, the evidence was insufficient for a jury to find he knew that Stephenson and Wallace were MPD officers.

Officers Stephenson and Wallace testified that they each issued multiple verbal commands, in a voice loud enough for Patterson to hear, in which they stated that they were police officers. There was also testimony that Patterson was approximately thirty to forty feet from Stephenson when Patterson pointed his .45 caliber pistol at the officer. The jury could, and inferably did, conclude beyond a reasonable doubt that the distance between Patterson and the officers and the other attendant circumstances did not prevent Patterson from hearing the officers' commands and their statements that they were police officers. *See Fletcher v. United States,* 335 A.2d 248, 251 (D.C.1975) (officers' testimony that they identified themselves to defendant before he fired upon them sufficient for conviction of assaulting a police officer). We are satisfied that the evidence was sufficient to permit the jury to find Patterson guilty of APOWA.

*Merger of ADW and APOWA Convictions*

 Patterson also argues that his convictions for his second ADW and his APOWA, stemming from his actions against the police officers rather than against Tyson, merge because they were the result of a single violent act. We review claims of merger of convictions *de novo. See Maddox v. United States,* 745 A.2d 284, 294 (D.C.2000). The action that gave rise to the second ADW charge involving Patterson occurred when he stopped in front of the unmarked police vehicle and pointed his pistol directly at the windshield, causing officers Stephenson and Wallace to crouch down to seek cover. Both officers testified to this assault. At the time of this assault, Patterson would not yet have known, or had reason to know, he was assaulting police officers.

Moments later, after the officers exited the vehicle and identified themselves as police officers, they commanded that Patterson and Scott stop and, as they gave chase, the next assault by Patterson occurred. However, this assault, as discussed above, was an APOWA. There was a clear separation between the first and second assaults. Patterson, in his brief, contends the assaults occurred "within a relatively short period of time." However, this is not the test for merger. Patterson had reached a "fork in the road" and decided to invade a separate interest in committing another, separate assault on Officer Stephenson when he aimed his pistol at him from a distance of thirty to forty feet. *See Maddox, supra,* 745 A.2d at 294–95.

*Vacation of PFCV Convictions*

■ Patterson's final argument is that his PFCV conviction stemming from his assault against Tyson and his PFCV conviction stemming from his assaults against the police officers should merge. As discussed above, these crimes were not the result of a single action. *See Reeves v. United States,* 902 A.2d 88, 90 (D.C.2006) (three PFCV charges do not merge although defendant assaulted three different victims in quick succession); *Stevenson v. United States,* 760 A.2d 1034, 1035–36 (D.C.2000) (two PFCV convictions affirmed where two predicate armed offenses do not merge). Patterson's assault against Tyson was a criminal offense separate from his assaults against the police officers because separate interests were invaded. In light of the foregoing, we affirm all of Patterson's convictions.

## II.

*Effect of Exclusion of Telephone Records on Scott's Defense*

■ Turning to appellant Scott, he argues that his convictions of ADW and PFCV must be reversed because of the erroneous exclusion of the records of the cellular telephone calls between Scott and Ms. Barnes.

■ The government now concedes the trial court erred in refusing to admit the cellular telephone records, but argues that it was not reversible error. The Constitution, whether in the Fifth Amendment's Due Process Clause or in the Sixth Amendment's Compulsory Process and Confrontation Clauses, guarantees a criminal defendant a fair and meaningful opportunity to present a complete defense. *McDonald v. United States,* 904 A.2d 377, 380 (D.C.2006) (citing *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). "Few rights are more funda-

mental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Our well-established rules of evidence serve the purpose of limiting evidence to that which is logically probative of some contested fact and does not lead to a confusion of the issues, mislead the jury or unfairly prejudice a party. *See (Markus) Johnson v. United States,* 960 A.2d 281, 293 (D.C. 2008); *see also* FED.R.EVID. 403.

Our task here is greatly simplified by the government's well-advised concession that the trial court erred in excluding the records of the telephone calls made to the cellular telephone taken from Scott. This concession permits us to focus on whether the error was of such magnitude as to require reversal. *See (James) Johnson v. United States,* 398 A.2d 354, 366 (D.C. 1979). To that end we will examine the contents of the proffered cellular telephone records.

*The Content of the Cellular Telephone Records*

The telephone records showed forty-three separate calls to the telephone number (202) 744–4241. All of the calls occurred between 12:07 a.m. and 10:38 p.m. on January 16, 2004, the day of the shooting. The proffered records showed that "Deborah Scott" was the name associated with the account under "Customer Information" and "Billing Information." "Brian Scott" is listed under the heading of "Main CBR."

Ms. Barnes testified that her home number was: (301) 630–0668. The records show five telephone calls from (301) 630–0668 to (202) 744–4241: at 1:06 a.m., 1:11 a.m., 1:16 a.m., 1:18 a.m., and 1:21 a.m. The records show that prior to Ms. Barnes's calls, Scott received four calls from three different numbers and another call between Ms. Barnes's first and second calls.

Ms. Barnes's testimony is roughly consistent with the telephone records, but notably lacking in detail. She testified her first call was made "just after midnight" and that Scott sounded normal. In the second call, Ms. Barnes testified that Scott alerted her that someone was shooting and she testified that she heard a loud noise like firecrackers. In her third and fourth calls, she testified that Scott was out of breath and stated he would call her back. Ms. Barnes testified she called Scott two more times, but was unable to reach him, although the records show only one more call between the two numbers. The second telephone call made from (301) 630–0668 to (202) 744–4241 lasted from 1:11:00 a.m. to 1:11:46 a.m. According to Ms. Barnes's testimony, it was in her second conversation that she heard "firecrackers." The only other specific time reference to the shooting is found in Officer Wallace's police report, which showed the shooting of Tyson occurred at 1:10 a.m. These coinciding times give powerful corroboration to Ms. Barnes's testimony.

We now consider whether the trial court's error in excluding the cellular telephone records was: (a) constitutional error which requires reversal, unless the government demonstrates that it was "harmless beyond a reasonable doubt" under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or (b) an error that should be evaluated under the less stringent harmless error test under *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[7] Scott contends that the trial court's ruling excluding the cellular telephone records

deprived him of his constitutional right to have a "meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (D.C.2006) (quoting *Crane, supra,* 476 U.S. at 690, 106 S.Ct. 2142). We agree.

Scott's defense was essentially that although he was at or near the scene of the shooting of Tyson, he was not involved in the crime. The only witness he called to provide a basis for that defense was a family friend, Ms. Barnes, the strength of whose testimony was somewhat diminished by a lack of detail but, more important, severely undermined by a remarkably large number of convictions of crimes involving dishonesty.

Appellant Scott's reply brief cogently summarizes the reasons that made the cellular telephone records of central importance to the defense.

Without any documentation of Ms. Barnes's phone calls to Scott, the government was able to characterize her account as an unsubstantiated and rather convenient tale told by a longtime family friend trying to get Mr. Scott out of trouble, while Mr. Scott was unable to support the account without forfeiting his constitutional right not to testify. Jurors had to believe, on Ms. Barnes's word alone, not only that she would call someone multiple times in the middle of the night, but that she had called Mr. Scott multiple times in the middle of the night, and further, that one of these calls took place precisely at the time that Mr. Tyson was shot. The excluded records

---

7. "But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely wheth-

er there was enough to support the result apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction must stand." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

would have provided independent verification as to each of these points, providing critical support to the defense theory. The fact that the records may not have proven the existence or content of certain conversations does not negate the importance of establishing the more basic facts regarding the making and timing of the calls.

The government argues that the exclusion of the records did not constitute constitutional error, as the defense was able to introduce through Ms. Barnes's evidence that suggested that Scott was not participating in the shooting of Tyson, citing, *inter alia, Burgess v. United States,* 786 A.2d 561, 578 (D.C.2001) ("Where ample ... evidence [has been] admitted on a particular issue, the defendant's constitutional rights are not implicated even if the trial court curtails his presentation."). The government also argues that the evidence of Scott's guilt was so strong that his conviction should stand. We are not convinced on either score.

We cannot agree that, by itself, the testimony of Ms. Barnes, lacking as it did in important details and vulnerable to withering impeachment, provided Scott with a meaningful opportunity to present the defense he sought to put before the jury. The government's case, while strong enough to put before the jury, was weakened by inconsistencies among its witnesses as to the number of assailants and which of them were shooting at Tyson.

The government argues that because the exclusion of the cellular telephone records did not deprive appellant Scott of the opportunity to present his defense, we should apply the less stringent *Kotteakos* standard rather than the "harmless beyond a reasonable doubt" *Chapman* standard. As we find that argument unconvincing, we conclude that the *Chapman* reasonable doubt standard applies. We add, however,

that the determination of which standard to use is not determinative of the outcome here. We could not find the error harmless under either standard. Scott was indeed deprived of a meaningful opportunity to present his defense and, in any event, we are convinced that we could not conclude with fair assurance that the judgment was not substantially swayed by the error. *See Harris v. United States,* 834 A.2d 106, 126–28 (D.C.2003) (exclusion of affidavit and defense witness deprived defendant of only corroborating evidence creating reversible error under *Kotteakos*); *cf. Howard v. United States,* 656 A.2d 1106, 1117–19 (D.C.1995) (trial court committed *Chapman* error in excluding defendant's testimony of complaining witness' prior assaults against him).

### III.

For the foregoing reasons, we affirm Patterson's convictions, but reverse Scott's convictions for assault with a dangerous weapon and PFCV, and remand his case for further proceedings consistent with this opinion.

*So ordered.*