Steven DeWITT, Appellant,

v.

DISTRICT OF COLUMBIA,
et al., Appellees.

No. 10–CV–510.

District of Columbia Court of Appeals.

Submitted Sept. 15, 2011.
Decided May 10, 2012.

Steven R. DeWitt filed a brief, pro se.

Irvin B. Nathan, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and James C. McKay, Jr., Senior Assistant Attorney General, were on the brief for appellees.

Before THOMPSON, Associate Judge, and PRYOR and NEBEKER, Senior Judges.

THOMPSON, Associate Judge:

Appellant Steven DeWitt appeals from an order of the Superior Court granting summary judgment in favor of defendants/appellees (the District of Columbia and four of its Metropolitan Police Department detectives) on DeWitt's complaint asserting common law claims of false imprisonment and malicious prosecution and a claim under the Unjust Imprisonment Act

(the "UIA"), D.C.Code §§ 2–421 to –424 (2001). For the reasons discussed below, we affirm.

## I. Background

A jury convicted DeWitt of second-degree murder and weapons offenses in connection with the May 13, 1991, shooting of Paul Ridley, and this court affirmed the conviction in an October 1, 1993, Memorandum Opinion and Judgment. In 2004, after having served over thirteen years of a fifteen-years-to-life sentence, DeWitt filed a motion under the Innocence Protection Act (the "IPA"), D.C.Code § 22–4135 (2001), to set aside his conviction. After a lengthy hearing, the Honorable Franklin Burgess, who had also presided over De-Witt's criminal trial, issued a 94–page memorandum opinion dated December 17, 2004, in which he detailed new evidence that an individual named Samuel Carson shot Ridley, and in which he described and analyzed numerous weaknesses and inconsistencies in the government's case against DeWitt. Judge Burgess vacated DeWitt's conviction and ordered a new trial, finding that it was "more likely than not that DeWitt is actually innocent," that "the evidence favoring Carson's guilt is stronger than that favoring DeWitt's," and that it was "more plausible to believe that Carson committed the killing." Judge Burgess stated, however, that he could not find by "clear and convincing evidence" that De-Witt was innocent.[1] After the United States Attorney declined to re-prosecute DeWitt, he was released from prison on December 24, 2004.

In June 2005, DeWitt gave notice to the Mayor of the District of Columbia of his intent to file a civil suit. In December 2005, DeWitt filed suit against the District and four police detectives[2] (together, the "District defendants"), asserting his false imprisonment, malicious prosecution, and UIA claims. After the trial court (the Honorable Judith Retchin) initially denied a series of dispositive motions brought by the defendants, and after the close of discovery, the court (the Honorable Robert Richter) eventually granted the District's renewed motion for summary judgment,[3] reasoning (1) that the false imprisonment claim against the District of Columbia was barred because of DeWitt's failure to give timely notice under D.C.Code § 12–309;[4] (2) that neither the false imprisonment claim nor the malicious prosecution claim could succeed because there was probable cause for DeWitt's arrest and prosecution; and (3) that because of Judge Burgess's ruling, collateral estoppel applied to preclude DeWitt from re-litigating the issue of whether, by clear and convincing evidence, he was innocent of the offenses of which he was convicted.

DeWitt challenges each of those three

---

1. DeWitt did not appeal that ruling.

2. The defendant/appellee detectives are Daniel Villars, Earl Delauder, John Davis, and Joseph Schwartz.

3. We note that "denial of a motion for summary judgment by one judge [to whom a case was initially assigned] does not foreclose grant of summary judgment by another judge [who succeeds to the assignment]." *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 593 (D.C.2000) (citation and internal quotation marks omitted).

4. In pertinent part, D.C.Code § 12–309 (2001) provides that "[a]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."

rulings, our review of which is *de novo*.[5] For the reasons discussed below, we agree with the last two rulings. Because our conclusion as to them enables us to affirm the grant of summary judgment, we need not discuss the first of the trial court's rulings. We therefore leave for another day the issue of whether (as DeWitt argues) long-term false imprisonment constitutes a continuous infliction of injury, such that giving notice of the claim within six months after any date on which the imprisonment continued constitutes notice "within six months after the injury ... was sustained" for the purposes of § 12–309.[6]

## II. The False Imprisonment and Malicious Prosecution Claims

██ "The gist of any complaint for ... false imprisonment is an unlawful detention...." *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C.1973). "[I]t is a familiar principle that probable cause for an arrest and detention constitutes a valid defense to a claim of false ... imprisonment." *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C.1996). For probable cause to exist, "it is sufficient that the arresting officer have a good faith, reasonable belief in the validity of the arrest and detention."

*Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102, 1104 (D.C.1983); *see also Weisman v. Middleton*, 390 A.2d 996, 1002 (D.C. 1978) (noting that probable cause "may flow from a belief that turns out to be unfounded as long as it is not unreasonable") (citation and internal quotation marks omitted); *Johnson v. United States*, 349 A.2d 458, 460–61 (D.C.1975) (explaining that the test of probable cause is "whether at the moment the arrest was made," ... "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed ... an offense") (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (internal quotation marks omitted)). "Probable cause must be supported by more than mere suspicion but need not be based on [the same quantum of] evidence sufficient to sustain a conviction." *Perkins v. United States*, 936 A.2d 303, 306 (D.C.2007) (citations and internal quotation marks omitted).

██ "The existence of probable cause will likewise defeat a claim for malicious prosecution...." *Gabrou*, 462 A.2d at 1104; *see also Prieto v. May Dep't Stores*

---

5. *See Mamo v. Skvirsky*, 960 A.2d 595, 599 (D.C.2008) ("Our review of the trial court's summary judgment award is de novo: summary judgment may be granted only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (citation and internal quotation marks omitted).

6. *But see George v. Dade*, 769 A.2d 760, 764–65 (D.C.2001) (noting that the legislative history of § 12–309 indicates that " '[t]he purpose of the [statute] is ... to assist [the District of Columbia] in the defense of the public interest where claims are made ... so long after the event that it is impossible for the District of Columbia to obtain evidence for use in litigation....' ") (quoting H.R.Rep.

No.2010, 72d Cong., 2d Sess. 1 (1933)); *cf. Hendel v. World Plan Exec. Council*, 705 A.2d 656, 667 (D.C.1997) (explaining that, for statute-of-limitations purposes, this court has held that "the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate") (citing *Nat'l R.R. Passenger Corp. v. Krouse*, 627 A.2d 489, 497–98 (D.C.1993)); *DeKine v. District of Columbia*, 422 A.2d 981, 986 (D.C.1980) ("The injury from false arrest occurs at the first moment of detention."); *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 n. 2 (D.C.1982) (holding that, at least for some purposes, "there appears to be no real difference between false arrest and false imprisonment") (citation omitted).

*Co.,* 216 A.2d 577, 578 (D.C.1966) ("There is no material distinction between reasonable grounds for detention in false imprisonment and probable cause in malicious prosecution."). "[T]o establish a case of malicious prosecution[,] there must be (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'Malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Jarett v. Walker,* 201 A.2d 523, 526 (D.C.1964) (citation and internal quotation marks omitted). As one court has observed, "[i]n an action for malicious prosecution, the plaintiff bears a heavy burden of proof to show lack of probable cause." *Schlueter v. S. Energy Homes, Inc.,* 252 Fed.Appx. 7, 9 (6th Cir. 2007) (citation and internal quotation marks omitted).

▆▆▆▆ The District defendants argue that summary judgment on DeWitt's false imprisonment and malicious prosecution claims was warranted because "[p]robable cause to arrest and imprison DeWitt until trial and to prosecute him is established by DeWitt's conviction, even though the conviction was later set aside." The applicable principle, however, is that "a prior conviction, although set aside or reversed and followed by an acquittal, is conclusive evidence of the existence of probable cause, *unless the conviction was procured by fraud, perjury or other corrupt means.*" *Bumphus v. Smith,* 189 A.2d 130, 131–32 (D.C.1963) (italics added, citations omitted). DeWitt alleged in his complaint that the defendants "erroneously testified" to the grand jury and at trial about eyewitness descriptions and photo identifications, manipulated a line-up identification and witness statements, beat and intimidated a witness (Christopher Hines) into implicating DeWitt in the murder, lost or withheld exculpatory information, and caused criminal proceedings to be instituted and continued against DeWitt, "even after [they] knew or reasonably should have known that no probable cause existed to support" the prosecution against him and his continuing detention. In his ruling after the IPA hearing, Judge Burgess made no findings confirmatory of those specific claims.[7] Nevertheless, because DeWitt's allegations amount to claims of fraud or corruption,[8] we decline to treat the fact of DeWitt's conviction as mandating a conclusion that there was probable cause for his imprison-

---

7. Judge Burgess did not reach the issue of whether Hines was beaten or whether Detective Villars gave false testimony before the grand jury. Judge Burgess did find that the *prosecutor* committed a *Brady* [*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] violation by failing to disclose the statement of a witness (Lawrence Sims) who told police just after the shooting that the assailant's car had blue and white temporary tags (thus describing the tags as being different in color from those on DeWitt's car). Judge Burgess also reasoned that the pre-trial disclosure of Sims's statement could have led to a different outcome at trial, because it would have corroborated the statement of eyewitness Rufus Pace that the assailant's car had blue and white tags. (As Judge Burgess put it, "[i]f the jury concluded that the car had blue and white temporary tags, DeWitt could not be guilty of the offense[.]") However, Judge Burgess made no finding as to whether any of the detectives were dishonest about, or complicit in withholding, Sims's statement.

8. *See also Harris v. Bornhorst,* 513 F.3d 503, 521–22 (6th Cir.2008) (explaining that "a *Brady* violation may rise to the level of fraud on the court"); *Youngblood v. West Virginia,* 547 U.S. 867, 869–70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) ("*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor[.]") (citation and internal quotation marks omitted).

ment and prosecution. Rather, we go on to consider whether, leaving aside the evidence that DeWitt alleges was tainted by police misconduct and considering the evidence that was withheld, there was enough "reasonably trustworthy information ... to warrant a prudent man in believing that [DeWitt] had committed ... [the] offense." *Beck,* 379 U.S. at 91, 85 S.Ct. 223; *cf. Sanders v. United States,* 550 A.2d 343, 345 (D.C.1988) (holding that false testimony supporting indictment was not material because other incriminating evidence presented to the grand jury also supported probable cause to indict).

■■■ Having reviewed the record, we agree with Judge Richter's conclusion, in his Order Granting Defendants' Motion for Summary Judgment, that the defendants "unquestionably had probable cause" to arrest and detain DeWitt and that no reasonable finder of fact "could find that [they] lacked either probable cause or a reasonable belief in probable cause." As Judge

Burgess's lengthy evidentiary summary recounted, two days after the shooting, when Detective Alexander Shepard showed eyewitness Rufus Pace a photo array, Pace selected DeWitt's photograph and one other in the photo array as resembling the shooter.[9] On May 23, 1991, Pace selected DeWitt from a line-up.[10] On May 15, 1991, eyewitness Mildred Greene, the cashier at the gas station where Ridley was shot (who testified at trial that she looked "right into [the] face" of the shooter), picked DeWitt's photo from a photo array. Greene also made an in-court identification of DeWitt as the shooter. And, when officers arrived at the scene of the shooting, they were informed by witnesses that the shooter was a black male who drove a red, two-door Acura bearing temporary tags. DeWitt fit that description and owned a red Acura with temporary tags, facts that Judge Burgess aptly characterized as "important corroborating evidence of [DeWitt's] guilt." Judge Burgess

9. DeWitt argues that Pace selected photographs 1A and 1C from the police photo array, rather than DeWitt's photo, which was 1F in the array. However, Judge Burgess summarized the evidence as being that "Pace looked at all of the pictures twice and selected two, one of which was DeWitt's." Having failed to appeal from Judge Burgess's decision (and, in particular, having failed to challenge Judge Burgess's evidentiary summary as not supported by the record), DeWitt is foreclosed from challenging that evidentiary summary now. *Cf. Montana v. United States,* 440 U.S. 147, 162, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) ("[A] fact, question or right distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." (citation, internal quotation marks and emphasis omitted)).

10. Although DeWitt argues that the line-up was suggestive (in that DeWitt was "forced" to wear a shirt similar to the one that Pace said the shooter wore), this court concluded, in the Memorandum Opinion and Judgment affirming DeWitt's conviction, that Pace's

line-up identification of DeWitt "was reliable despite the suggestive lineup." Pace also identified DeWitt at trial as the shooter.

DeWitt also highlights Pace's description of the shooter as "stocky" and of a dark brown complexion and witness Ronnie Oliver's contrasting description of the shooter as "light" complected (whereas DeWitt was none of those things). However, inconsistencies in the testimony of the key witnesses "can be found in almost any [criminal matter]." *In re A.H.B.,* 491 A.2d 490, 495 (D.C.1985); *see also Scott v. United States,* 975 A.2d 831, 839 (D.C.2009) (noting that the government's was "strong enough to put before the jury," even though it was "weakened by inconsistencies among its witnesses as to the number of assailants and which of them were shooting"). Witnesses' inconsistent or erroneous recollections of the details of traumatic events do not mean that a reasonable police officer could not rely on those recollections, or some portions of them, as a basis for a reasonable belief that an individual to whom they point as a suspect is indeed the perpetrator.

found that in light of all the foregoing evidence (and additional evidence that we need not discuss), "[t]here exist[ed] too much evidence indicating DeWitt's guilt" for him to find by clear and convincing evidence that DeWitt is innocent. That same "too much evidence" provided probable cause for DeWitt's detention and prosecution.[11]

Moreover, we see no evidence in the record (and DeWitt points to none) that his conviction was maliciously sought or that defendants had a "primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Jarett*, 201 A.2d at 526. As Judge Richter noted, "[a]lmost all of the evidence implicating Carson" as the killer—most importantly, the testimonies of John Smith, James Montgomery, and Douglas Eatmon that they either saw Carson shoot Ridley, heard Carson admit to the shooting, or heard an associate of Carson say that Carson did the shooting—"emerged well after trial." DeWitt points to no evidence, and we see none, that any of the defendants doubted DeWitt's guilt or believed he was innocent, but nevertheless lent support to his detention and prosecution. For all the foregoing reasons, we conclude that Judge Richter did not err in granting summary judgment to the District defendants on DeWitt's false imprisonment and malicious prosecution claims.

## III. The UIA Claim

The UIA provides that "[a]ny person unjustly convicted of and subsequently imprisoned for a criminal offense contained in the District of Columbia Code may present a claim for damages against the District of Columbia." D.C.Code § 2–421. It further specifies that:

Any person bringing suit under § 2–421, must allege and prove:

(1) That his conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction; and

(2) That, based upon clear and convincing evidence, he did not commit any of the acts charged or his acts or omissions in connection with such charge constituted no offense against the United States or the District of Columbia the maximum penalty for which would equal or exceed the imprisonment served and he did not, by his misconduct, cause or bring about his own prosecution.

D.C.Code § 2–422.

By contrast, the IPA provides that "[a] person convicted of a criminal offense in the Superior Court of the District of Columbia may move the court to vacate the conviction or to grant a new trial on grounds of actual innocence based on new evidence." D.C.Code § 22–4135(a). "Un-

---

11. DeWitt urges us to focus on the evidence, highlighted at the IPA hearing, that witnesses described the red Acura's temporary tags as being blue and white and as having either "825 or 829" as the last three numbers (whereas DeWitt's Acura had red and white temporary tags and the tag number "818–461"), and that the prosecutor obtained information that someone had tried to frame DeWitt for Ridley's murder. Judge Burgess found, however, that the government's evidence about whether police officers heard the tag number "818" from witnesses on the scene (instead of from a detective who had already stopped DeWitt's car and seen that number on the license plate) was "ambiguous." We cannot disagree with that characterization. Further, Judge Burgess's order recounts that it was not until September 2001 that the prosecutor obtained information (from Kabria White) about a possible attempt to frame DeWitt.

less the motion and files and records of the case conclusively show that the movant is entitled to no relief," the "movant shall be entitled to invoke the processes of discovery available under Superior Court Rules of Criminal Procedure or Civil Procedure, or elsewhere in the usages and principles of law if, and to the extent that, the judge, in the exercise of the judge's discretion and for good cause shown, grants leave to do so[.]" *Id.* § 22–4135(e)(1), (4). At the conclusion of a hearing on the motion, if "the court concludes that it is more likely than not that the movant is actually innocent of the crime, the court shall grant a new trial." *Id.* § 22–4135(g)(2). If, however, "the court concludes by clear and convincing evidence that the movant is actually innocent of the crime, the court shall vacate the conviction and dismiss the relevant count with prejudice." *Id.* § 22–4135(g)(3).

DeWitt contends that he satisfied the first prong of the UIA because Judge Burgess's finding, pursuant to the IPA, that it was "more likely than not" that he was "actually innocent," and the resultant reversal of his conviction, meant that his "conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted" within the meaning of § 2–422(1) of the UIA. In his summary judgment order, Judge Richter found that proposition "debatable," but ruled that even if it were correct, DeWitt could not satisfy the requirements of § 2–422(2) of the UIA, which required him to allege and prove that, "based upon clear and convincing evidence, he did not commit any of the acts charged." Judge Richter reasoned that Judge Burgess's "explicit decision[ ] that there was not clear and convincing evidence of [DeWitt's] innocence" precluded DeWitt from seeking

to prove the contrary in this case. More specifically, Judge Richter found that DeWitt was collaterally estopped from relitigating the issue of his innocence.

The question whether Judge Burgess's finding by a preponderance of the evidence that DeWitt did not murder Ridley satisfied § 2–422(1) does not admit of an easy answer. We note, on the one hand, that this first prong of the UIA is "identical to the comparable provision in the [counterpart] federal law," 28 U.S.C. § 2513. *See* D.C. Council, Report on Bill 3–251 at 6 (July 9, 1980) ("Committee Report").[12] Interpreting that identical federal provision, at least one appellate court has reasoned that a "conviction [that] was set aside ... on a ground that leaves room for the possibility that the petitioner in fact committed the offense with which he was charged" and thus for the possibility of a retrial (as Judge Burgess's ruling under the IPA left open for DeWitt) would not satisfy the requirements of the statute. *Betts v. United States,* 10 F.3d 1278, 1284 (7th Cir.1993) (applying 28 U.S.C. § 2513(a)(1)); *see also Jones v. United States,* 2011 WL 2516600, at *1–2, 2011 U.S. Dist. LEXIS 51029, at *4 (E.D.Mo. May 12, 2011) (holding that the first prong of 28 U.S.C. § 2513 was satisfied where the defendant's guilt "could not have been established beyond a reasonable doubt" (such that a retrial would not have been appropriate)). On the other hand, it makes sense to say that DeWitt's "conviction was set aside on the ground that he was not guilty of the offense with which he was charged" since Judge Burgess found by a preponderance of the evidence that he was not guilty.

We conclude that, like the trial court, we need not decide definitively whether the first prong of the UIA is satisfied by reversal of a conviction and remand for a

---

**12.** Similarly, the language of the second prong, D.C.Code § 2–422(2), "basically tracks the language of the federal unjust imprisonment statute." Committee Report at 6, 7.

new trial on the basis of a finding that a defendant more likely than not is innocent. We can assume without deciding that the first prong was satisfied because we agree with Judge Richter's determination that, on the facts of this case, DeWitt was estopped from attempting to prove that he satisfied the requirements of the second prong of the UIA.[13]

 Collateral estoppel, also known as "issue preclusion," bars the re-litigation of issues determined in a prior action "where (1) the issue was actually litigated; (2) was determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the party; (4) under circumstances where the determination was essential to the judgment." *Wilson v. Hart*, 829 A.2d 511, 514 (D.C. 2003). Each of those conditions for applying the doctrine is present here. First, the issue presented by DeWitt's UIA complaint was whether DeWitt, "based upon ... clear and convincing evidence ... did not commit any of the acts for which he was convicted." (Complaint, ¶ 43) That is the same issue Judge Burgess decided under the IPA: he ruled that he could not find by clear and convincing evidence that DeWitt is "actually innocent of the crime." D.C.Code § 22–4135(g)(3). Second, Judge Burgess's ruling was a final judgment, which DeWitt did not appeal (as he was entitled to do under § 22–4135(i)), and the validity of which (as distinguished from the correctness of its conclusions) DeWitt does not dispute. To skip to the fourth condition, Judge Burgess's ruling that he could not find DeWitt's innocence by clear and

convincing evidence was essential to his judgment reversing the conviction but granting a new trial. *Id.* § 22–4135(g)(2). DeWitt does not dispute that these conditions were satisfied.

That leaves the third condition—whether, during the IPA hearing, DeWitt was denied "a full and fair opportunity for litigation." It is uncontroverted that the hearing on DeWitt's motion under the IPA involved several weeks of testimony and voluminous documentary evidence. DeWitt contends, however, that he was denied a full opportunity to litigate the issue of his actual innocence because he did not have the opportunity to cross-examine "crucial witnesses" (including Greene, who DeWitt asserts was a biased witness, and Pace) whose "grand jury testimony and FBI interviews were introduced into evidence by the Government over [DeWitt's] objection."

There are a number of reasons why we cannot agree that DeWitt was denied a full and fair opportunity to litigate the issue of his innocence. The first is, again, that DeWitt did not appeal Judge Burgess's order, thereby forgoing the opportunity to challenge Judge Burgess's rulings that the government would be permitted to introduce into evidence at the IPA hearing certain grand jury transcripts and FBI interview narratives to which DeWitt's counsel objected. In addition, as defendants/appellees point out, in DeWitt's opposition to their motion for summary judgment, DeWitt acknowledged that the grand jury testimony was admissible since both Greene (who "cannot be located") and

---

**13.** DeWitt argues that the UIA "contemplate[s] that the issue of innocence will be litigated in a[t] least two proceedings" and affords a defendant an opportunity to "allege and *prove*" his actual innocence. Such an opportunity would be appropriate where the issue of actual innocence has not already been adjudicated (for example, where the UIA plaintiff is proceeding on the basis of having been found "not guilty" after a retrial in which the "beyond a reasonable doubt standard" was applied, but in which the finder of fact made no determination of actual innocence *vel non* ). As we go on to discuss, it is not appropriate here.

Pace (who is dead) were unavailable to testify. Further, during the IPA proceedings, DeWitt's counsel told the court that "[h]aving now been allowed to read the Rufus Pace [FBI] interview, ... I don't object." Counsel also withdrew her objection to the Greene FBI interview, which she "view[ed] ... as a wash." Because we will not permit DeWitt to take a position in this appeal that is contrary to the position he took in the IPA proceeding, we reject his argument that his lack of opportunity to cross-examine Pace and Greene as to their grand jury testimony and FBI interviews means that he was denied a full and fair opportunity to litigate the issue of his actual innocence during the IPA hearing.[14]

DeWitt also argues that he was "unfairly restricted to limited discovery during the IPA hearing." However, as the defendants/appellees have argued, DeWitt does not assert that he made a request to Judge Burgess for leave to utilize "the processes of discovery available under Superior Court Rules of ... Civil Procedure," a request the court would have had discretion to grant under D.C.Code § 22–4135(e)(4). DeWitt asserted in the trial court that it was "unrealistic to think that Judge Burgess would have entertained, much less granted, a request for a civil deposition of [the] witnesses" DeWitt wished to question, but we are unpersuaded by that seemingly unfounded contention.

We note, moreover, that (according to DeWitt's brief and as reflected in the trial court record), DeWitt's counsel took nine depositions (including those of the defendant detectives) before discovery closed in this case. Yet, we do not see in the record anything to indicate that after the close of discovery, DeWitt ever supplemented his response to the defendants' interrogatories (which he initially answered in September 2008), in which he stated that he "ha[d] not learned any information through the civil discovery process in this case that was not previously available (or made available) or not known to him during his Innocence Protection Act proceedings."[15] In addition, witnesses who were unavailable during the IPA proceedings because they were dead by that time (including Pace, the victim Ridley, Kyle Knight and Stevie Ellington) are, of course, still unavailable. As to other witnesses who DeWitt has acknowledged were in witness protection programs or had relocated, he has not explained how he would obtain their presence at trial against the District defendants,[16] or what he would expect the witnesses to add to the evidence that Judge Burgess heard. We highlight these points to note that DeWitt has not explained what opportunity, that he did not have during the IPA proceeding, a trial in this UIA case would give him to litigate successfully the issue of his innocence.

We conclude that the trial court correctly ruled that DeWitt was collaterally estopped from re-litigating the issue of his innocence by clear and convincing evidence. Accordingly, the court did not err

14. *Cf. Brown v. United States,* 627 A.2d 499, 508 (D.C.1993) ("[A] defendant may not take one position at trial and a contradictory position on appeal."); *see also Mason v. United States,* 956 A.2d 63, 66 (D.C.2008) (describing the ground for applying judicial estoppel to preclude a party from taking a position contrary to the one that he induced a court and an opposing party to rely on previously).

15. The record shows that as of the date of a January 29, 2010, pleading, DeWitt had not supplemented his interrogatory response.

16. Our point is that even if (as DeWitt suggests) the United States Attorney's Office had some ability to produce the witnesses during the IPA hearing, we see no reason to think that the District defendants have that same ability.

in granting summary judgment to the District on DeWitt's UIA claim.

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*